## Denner *v.* Beyer, Appellant.

Argued April 12, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

reargument refused June 29, 1945.

*Robert Trucksess,* for appellant.

*Frederick B. Smillie,* with him *Smillie & Bean,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 21, 1945:

This is an appeal from the decree of the Court of Common Pleas of Montgomery County, appointing upon the petition of the respondent's sister, Mary I. Denner, a guardian for Bertha I. Beyer, whom the court adjudged to be "mentally defective" and "unable to take care of her property." The proceedings were under the Act of May 28, 1907, P. L. 292 (50 P.S. Sec. 941 et seq.). At the time the decree was entered, Mrs. Beyer was sixty and a half years old and in possession of personal property inherited from her husband and amounting to more than $22,000. Mrs. Beyer denied the petition's averments as to her being weak-minded and declared in 1943 that she gave her brother-in-law, William Denner (Mary's husband), power of attorney upon his and his wife's promise to give the respondent "a home for life with them." She also stated that a savings account had been opened in the Montgomery National Bank in the name of Bertha I. Beyer and Mary I. Denner, and an account in the Peoples National Bank had been opened in the name of William Denner and Bertha I. Beyer; and further, that William Denner and Mary I. Denner

then took control of the pass books; and that she was only in their home a short time when they took her to a home in Ephrata, Pennsylvania, and finally to the Bernhart Home, on Germantown Pike, near Norristown, Pennsylvania, "against her wishes and against the agreement of the aforesaid William Denner and his wife, Mary I. Denner."

She averred that the petition was not filed in good faith, but was motivated by a desire on the part of the petitioner and her husband, to gain control of her property and thus "to accomplish the very wrong intended to be guarded against."

In *Hoffman's Estate,* 209 Pa. 357, 58 A. 665, Chief Justice MITCHELL, speaking for this Court, said of the Act of June 25, 1895, P. L. 300, which was the act which then governed proceedings for the protection of persons who were "so weak in mind that he or she is unable to take care of his or her property," that it was "a dangerous statute easily capable of abuse by designing relatives to accomplish the very wrong intended to be guarded against, and therefore to be administered by the courts with the utmost caution and conservatism." This statement has been repeated by this Court in subsequent cases. See *Bryant's Estate,* 211 Pa. 633, 61 A. 250.

The record gives the impression that the motive for the petition was not so much to conserve the respondent's property as to channel its inheritance to the next of kin. There was no evidence whatsoever that Mrs. Beyer was dissipating her property, unless such evidence is found in what she did in the interests of two of the persons, Mr. and Mrs. William Denner, who are now asking that the control of her estate be taken away from her. Mrs. Denner did not raise any question as to Mrs. Beyer's mental competency until the latter revoked (1) the will in which Mrs. Denner was the chief beneficiary, and (2) the power of attorney in favor of Mr. Denner.

Shortly after her husband died on December 14, 1943, Mrs. Beyer made a will, distributing the estate inherited

from him, as follows: a one-half part to the two sons of her husband's brother, Norman B. Beyer, a three-sevenths part to the six children of her brother, Earl Hunsicker, and a one-fourteenth part to Harry Christman, the son of Ethel Lumis, Mrs. Beyer's sister. Mary Denner and her husband then took Mrs. Beyer into their home and, according to Mrs. Beyer, induced her to make a will leaving Mrs. Denner a life estate in Mrs. Beyer's property, with power to consume it. This was on January 19, 1944. Eight days later Mary Denner and Mrs. Beyer opened a joint account in the Montgomery National Bank of Norristown, and on April 14, 1944, William Denner and Mrs. Beyer opened a joint account in the Peoples National Bank of Norristown, and William Denner put $952 of Mrs. Beyer's money in his own safe deposit box.

On April 12, 1944, Mary and William Denner, by what Mrs. Beyer claims was a subterfuge, placed her in a home in Akron, Pennsylvania. This home charged $25 a week for her maintenance. On or about July 1, 1944, Mr. and Mrs. Denner brought Mrs. Beyer to the Bernhart Home near Norristown, which maintained her for $15 a week. Mrs. Beyer described the conditions in the Bernhart Home as "terrible, they were worse yet." Mrs. Beyer communicated with her pastor, Rev. R. L. Williams and Florence Slough, the latter being a cousin of Mrs. Beyer's deceased husband, and they took her from the Bernhart home on October 9, 1944, and she went to live with her deceased husband's brother, Norman Beyer and Mrs. Beyer. On the same day she was taken to the office of Robert Trucksess, Esq., attorney for Norman Beyer, and Dr. Paul Atkinson was called in to ascertain if she was capable of taking care of her own property. As a result of this examination she appointed Florence Slough, her Attorney-In-Fact, revoking the power of attorney previously given to William Denner. On the same day she revoked the will virtually giving her whole estate to her sister, Mary Denner, and made a new will

in which she bequeathed $500 to the Trustees of the Lower Providence Presbyterian Church, of Eagleville, Pa., for the care and upkeep of the Raymond Beyer lot in the church cemetery, and $500 for the erection of a class room to be named the Raymond and Bertha Beyer Room, and all the remainder she gave to her nephews and nieces as she had in the first will she made in 1943. She made Florence Slough executrix. On October 10, 1944, she was placed in a home in Unionville, Pennsylvania. On October 26, 1944, she was brought back to Norman Beyer's home, and she is still there. Mrs. Mary Denner's petition to have Mrs. Beyer declared incompetent to take care of her own property was executed and filed on the 16th day of October, 1944, seven days after Mrs. Beyer made her last will and testament, revoking the will which made Mrs. Mary Denner the chief beneficiary.

If Mrs. Beyer should be decreed so mentally defective as to be incapable of managing her own property, this would raise a presumption * of her incapacity, after the date of the decree, to make a will, and this could only be overcome by evidence of restoration of mental faculties or at least of a lucid interval. It is true that the decree of Mrs. Beyer's mental incompetency was made in this case subsequent to the will of October 9, 1944, but such a decree if sustained by this Court would naturally encourage an attack, after Mrs. Beyer's death, upon her capacity to make a will on October 9, 1944, only fifty-nine days before the decree was entered. The fact that Mrs. Beyer was adjudicated mentally defective at a date so close to the execution of her will might have weight with any tribunal which might later have to pass

---

* In the *Estate of Mary Griffin, Decd.*, 109 Pa. Superior Ct. 594, 601, it was held that "there was an adjudication that the testatrix was a weak-minded person, a presumption of incapacity was raised, and the burden was on the proponents to overcome it, under the authority in *Hoffman's Estate*," supra.

on her capacity to make a will on October 9, 1944. If it should later be determined that Mrs. Beyer lacked capacity to make this will of October 9, 1944, and if as a result thereof Mrs. Beyer should die intestate, her property would go to the next of kin, to wit: Mary Denner, Ethel Lumis, Quinton Hunsicker, Earl Hunsicker and Norman Hunsicker, her two sisters and three brothers, respectively. All of these next of kin, with the exception of Earl Hunsicker, testified as to her incompetence to manage her own affairs. The fact that they would profit by Mrs. Beyer dying intestate is a fact to be considered in judging the weight of their testimony. Earl Hunsicker, another brother, did not testify in the case on either side. Under the last will of Mrs. Beyer, Earl Hunsicker's six children inherit three-sevenths of her residuary estate.

All parties agree that Mrs. Beyer has suffered from diabetes, which she has had for three years, and that as a result thereof she is partially blind. Mary Denner testified that Mrs. Beyer "ought to have a guardian appointed," and that she, the witness, did not think that Mrs. Beyer was capable of taking care of her property. Norman Hunsicker was asked the following question: "Do you think she knows the extent of her property or how to handle her affairs?" The answer was: "She may at time and again she don't know; she could be influenced." Quinton Hunsicker was asked: "In your opinion is she [Mrs. Beyer] liable to be the victim of designing persons?" He answered: "I would say yes." When asked "Is she easily influenced?" he answered: "Yes, I would say yes." Dr. John M. Brecht testified that he saw Mrs. Beyer on several occasions between the dates of December 20, 1943, until April 12, 1944. He was asked: "As a result of your observation of her and examinations of her do you consider her liable to become the victim of designing persons?" He answered: "I do." He was asked: "Is she able or unable to take care of her property?" He answered: "I would feel she was

unable." He was further asked: "In your opinion she is very liable to dissipate or lose her property because of her mental condition?" He answered: "It is possible, yes. I feel she could be." On cross-examination he is asked: "What evidence did you have up to October 9th, that she wasted money?" He answered: "I have no evidence." "Q. What evidence do you have that made you conclude she was so weak in mind— A. I have no evidence except my judgment from seeing her as a sick woman. I have never seen her with the idea of giving a mental opinion. Q. And you are not going to state she has any mental deficiency? A. I haven't stated that." Ethel Lumis was asked: "Do you think she is weak mentally?" She answered: "I do." On cross-examination she was asked: "And possibly because of her physical infirmity rendering it difficult for her to handle her affairs, that is the reason you want a guardian appointed?" She answered: "Yes." Q. "They are the only reasons? A. She is not capable." Nelson P. Fegley, a member of the Montgomery County bar, testified that he had occasion to discuss property matters with Mrs. Beyer in the latter part of 1943 and other times. He was asked: "In your opinion is Bertha I. Beyer liable to become the victim of designing persons?" He answered: "I do think so." Q. In your opinion is she able to properly take care of her property? A. Physically she is almost blind and she is in that respect, but I think she would be very easily influenced."

William Denner, the petitioner's husband, testified that Mrs. Beyer is "not able to take care of her property" and is "liable to become the victim of designing persons." He admitted that $952.72 in cash belonging to Mrs. Beyer was placed in his safe-deposit box. On cross-examination he stated that he put this money in his safe deposit box "for emergency." It was not "ear-marked" as Mrs. Beyer's money. He said: "It is there and it is all right."

In behalf of the respondent, Dr. Paul Atkinson testified that he examined Mrs. Beyer on the date she made

her will, October 9, 1944, that he found her to be rational, that her mind was clear and he answered "no" when asked if she "was so mentally weak that she would become the victim of designing persons." He described her physical condition as "a heart condition primarily." He said her conversation was not confused or incoherent or unresponsive. Dr. Davis Nathan testified that he gave Mrs. Beyer a psychiatric examination on October 9, and on October 30, 1944. He said he thought her "quite capable of making a will" and not so weak in mind that she would waste her property or become the victim of designing persons. He testified that she had "the capacity to act rationally." He examined her again on November 1st and formed a favorable opinion of her mental condition. She acted rationally and her replies to questions were coherent and responsive. Mary Dettra testified that she had known Mrs. Beyer 27 years, that she talked with her on August 6, 1944, in the "Bernhart home" and found no difference in her conversation than there was the other 26 years." She said Mrs. Beyer's mind seemed normal. When the witness was asked: What did she [Mrs. Beyer] say about her sister, Mary Denner, the witness replied: "they had promised her a home as long as she lived and she said 'they put me in a place like this.'"

Florence Slough, above mentioned, testified as to the neglected condition Mrs. Beyer was in when she was at the Bernhart home, and that Mrs. Beyer "cried and asked her to get her out of there." She stated that Mrs. Beyer was not so weak in mind that she would dissipate her property. She testified that when Mr. and Mrs. Norman Beyer took the respondent out of the Bernhart home "she was so happy she walked; they had been keeping her in bed." Norman Beyer, respondent's brother-in-law, testified he had known the latter 39 years, and that when he and his wife took her out of the Bernhart home she said: "Thank God for that." He pronounced her capable of taking care of her own property. He de-

nied that her mind was weak. He sees her daily in his own home, where she resides.

Rev. R. L. Williams, who has been Mrs. Beyer's pastor for 27 years, testified: "She is to me today as she was twenty-seven years ago. Her conversation just as clear, it is a little slower." When he visited Mrs. Beyer in the Bernhart home, she wept and said "she wanted to get out of there." She told him: "They got my money and put me out." The witness had talked to Mrs. Beyer within a week of the hearing, and he found her neither confused nor incoherent nor unresponsive. He answered: "I am quite sure" when asked: "In your opinion does she have the mental capacity to act rationally?" He also said that "the beneficiaries [of the will] are those whom she wanted to have her money from the beginning, the nieces and nephews."

Bertha Beyer, the respondent, was examined by opposing counsel, in the presence of the hearing judge, in Mrs. Beyer's bedroom at the home of Mr. and Mrs. Norman Beyer at Trooper, Pennsylvania, on November 16, 1944. She told of the promises of Mr. and Mrs. William Denner to take care of her if she would turn her money over to them, and that Mrs. Denner wanted her to "make a will leaving everything to her" and promising Mrs. Beyer that she could stay with the Denners the rest of her life. She said: "As soon as they got my money they got tired of me and put me out." They got her to go to the Akron home by telling her they "wanted to look at it." After she was there three or four months they took her to the Bernhart home, where the cost of maintenance was $10.00 a week less than it was at the Akron home. She found conditions in the Bernhart home to be "terrible." She said that when she made a will in January, 1944, she "left everything to Mary Denner." She added that she wanted the will of October 9, 1944 "to stand." She also said: "I don't want the Denners to get anything; they had too much already." The following questions and answers appear in her examination in chief:

"Q. Do you want Judge DANNEHOWER to say that a bank must be guardian for you and for all your money? A. No. Q. You want to keep your money and have Florence Slough your attorney in fact? A. Yes, she will take care of me. Q. And she told you she will put an account in the Montgomery National Bank in your name alone? A. Yes. Q. And then she will write checks because you can't see? A. Yes, that is the way I want it." Her replies to questions, both on direct and cross-examination are very convincing as to her comprehension and her clarity of mind. They do not support the allegation as to her being feeble-minded. As President Judge KELLER said in *Ryman's Case,* 139 Pa. Superior Ct. 212, 11 A. 2d 677: "One's mental capacity is best determined by his spoken words, his acts and conduct."

As the last witness in the case, the petitioner called Dr. Alfred N. Noyes, who is "in charge of the State Hospital at Norristown." He described Mrs. Beyer as "a very sick woman physically." He did *not* pronounce her "mentally defective," but he answered "Yes" to the question: "In your opinion is she weak-minded?" A little later his answer indicated that Mrs. Beyer's "weakness of mind" was merely the "impairment" of "her mental faculties in certain respects." The first question asked him on cross-examination was "What mental faculties?" and he replied: "Her memory was particulary impaired." He also stated on cross-examination that Mrs. Beyer's answers to his questions (in a two hour examination) "were coherent but not accurate." When asked how he knew they were not accurate, he replied that they "did not agree with information" he "had received." The only "inaccuracy" he could specify was that Mrs. Beyer told him that she had "never signed a power of attorney, that she gave Mrs. Slough a power of attorney by word of mouth." He admitted that Mrs. Beyer understood his questions and was "not mechanically confused [but] was confused as to time." When he was asked on cross-examination if Mrs. Beyer was

"so weak-minded that she is not able to transact her own business affairs in relation to an estate of around $20,000," he answered "I feel so, yes, that is my opinion." When asked on his direct examination: "Would she or not be likely to become the victim of designing persons?" he replied "She might." Neither the doctor's testimony nor the testimony of any other person called by the petitioner gives strong support to the decree that Mrs. Beyer is mentally defective and owing to weakness of mind is unable to take care of her property and in consequence thereof is liable to dissipate or lose the same and become the victim of designing persons.

In *Ryman's Case,* supra, President Judge KELLER, speaking for the Superior Court, said: "The statute of 1907 is a dangerous one, to be administered with great caution, because it is capable of abuse and may be used by one's relatives to take the custody and control of his property improperly away from him." (Citing cases.)

Judge DANNEHOWER in his opinion dismissing exceptions to the decree says within the past year respondent had made three different wills and had given two different powers of attorney, placing her property in the control of others. He, like appellee's counsel, seems to think that this indicates weakness of mind on the part of Mrs. Beyer. We do not so interpret these actions of hers. When her husband died and she found herself in possession of $22,000, she made a will without delay. In that will she bequeathed half of her inheritance to her husband's nephews and the other half to her own nieces and nephews. Then when her sister offered her a home for the remainder of her life on condition that Mrs. Beyer make a new will bequeathing the estate to her, the proposal appeared to be a reasonable one and she accepted it. When the sister failed to fulfill her part of the agreement, and turned her out of her home and placed her in a strange environment which she found intolerable, Mrs. Beyer upon her emergence therefrom made a will revoking the will in favor of the sister

and virtually reëstablished the first will, except for a bequest of $500 for the care and upkeep of the Raymond Beyer cemetery lot and $500 for the erection of a class room to be named the Raymond and Bertha Beyer Room in the Lower Providence Presbyterian Church. In all these transactions Mrs. Beyer acted like a woman with a mind of her own. Her revocation of a power of attorney given her brother-in-law, from whose home she had been evicted, and the execution of a power of attorney in favor of her trusted friend, who was her husband's cousin, was likewise reasonably called for under the circumstances. Instead of exhibiting the vacillation characteristic of weakness of mind, she exhibited the decision characteristic of strength of mind.

This respondent's entire testimony shows that she had a keen sense of the responsibility which her inheritance had imposed upon her, and that she desired to conserve her estate during her lifetime, and upon her decease to distribute half of it to her husband's nephews and the other half to her own nieces and nephews. No one suggests anything abnormal or unreasonable about her will. There is no proof whatever that any of the beneficiaries named in her will were "designing persons" or that they had attempted to exercise any influence upon her.

It is a serious thing to deprive any person of the control of their own property or of their right to dispose of it by will. This right will be judicially taken away from a person only after preponderating proof of his lack of mental capacity to manage his own business affairs. There is no such proof in this record. In fact, the proof strongly preponderates in favor of this respondent. If later she exhibits such feeble-mindedness or mental defectiveness as is likely to result in the dissipation or loss of her property, the courts are open for appropriate proceedings. On this record the decree appealed from is unwarranted.

The decree is reversed at the cost of the appellee.