Owens Appeal.

Submitted March 29, 1950. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Edward J. McGrath* and *Herbert Mayers,* for appellants, submitted a brief.

*William P. Cairo,* for appellees, submitted a brief.

OPINION BY RENO, J., July 20, 1950:

Upon the petition of her daughter Amelia, Bertha M. Owens was adjudged "not able, owing to weakness of mind to take care of her property", and in conformity with the Act of May 28, 1907, P. L. 292, as amended, 50 P.S. §941, et seq., a guardian was appointed for her. She and her son James appealed.

Mrs. Owens is 81 years old, afflicted since 1940 with rheumatism and arthritis, and for two years has been confined to a bed in a nursing home. She requires help to get in or out of bed, and for dressing and eating, having no strength in her crippled hands, and experiences pain when she moves her legs. She was not brought into court, and the hearing judge lacked opportunity to

observe personally her appearance and her mental capacity, always considered a potent factor on appellate review. *Graham v. Miller,* 57 Pa. Superior Ct. 479; *Arthur's Case,* 136 Pa. Superior Ct. 261, 7 A. 2d 55; *Wingert Case,* 163 Pa. Superior Ct. 616, 63 A. 2d 441.

The sister is fighting her brother for control of their mother's property. "The record gives the impression that the motive for the petition was not so much to conserve the respondent's property as to channel its inheritance to the next of kin": *Denner v. Beyer,* 352 Pa. 386, 388, 42 A. 2d 747. Their father died September 8, 1949, and by his will left his entire estate, valued at $65,000, to his widow, and appointed her and the son executors. Mrs. Owens renounced, the son qualified as executor, and at her request has managed the affairs of the estate. Ill feeling between brother and sister probably originated in 1933, when their father retired from the retail hardware business, and turned it over to the son, who had assisted him in it. The daughter instituted this proceeding on September 22, 1949, and the hearing was held on October 7, 1949. Between those days, on October 1, 1949, to be precise, the mother made a will, giving the daughter $2000, small legacies to her grandchildren and a niece, the remainder to her son, and appointed him executor. The Act of 1907, supra, and its antecedent, have been declared dangerous statutes, which are to be administered with the utmost caution and conservatism. *Hoffman's Est.,* 209 Pa. 357, 58 A. 665; *Ryman's Case,* 139 Pa. Superior Ct. 212, 11 A. 2d 677. A decree operates prospectively only, *Ryman's Case,* supra, but a will made during the pendency of the proceeding may be jeopardized by a decree. "Owing, however, to the shortness of the interval between the execution of the will and the decree of the common pleas, the latter is proper evidence for consideration in a contest over the former": *Mulholland's Est.,* 217 Pa. 65, 68, 66 A. 150. That possible, indeed probable, consequence emphasizes the duty

of a court to proceed cautiously in the administration of this inherently dangerous statute.[1]

The hearing judge, animated by commendable motives, appointed a guardian to allay the controversy between brother and sister. This appeal indicates the degree of success attained by the decree. He held that the decree was an exercise of judicial discretion vested in him, reversible only for its abuse. Expressions to that effect occur in cases where courts have appointed temporary receivers or selected particular guardians from among available or recommended persons. *Parke's Case*, 41 Pa. Superior Ct. 531; *Voshake's Est.*, 125 Pa. Superior Ct. 98, 189 A. 753; Cf. *In re Oscar Misselwitz*, 177 Pa. 359, 35 A. 722. But the Supreme Court has ruled: "Applications of this nature are not to be encouraged and should not be granted except in a clear case": *Bryden's Est.*, 211 Pa. 633, 61 A. 250. This Court has held that a decree will not be entered where the evidence "falls short of exhibiting the clearness and strength which must be present when the extraordinary power is invoked with which the court is invested": *In re Anna C. Brinton*, 86 Pa. Superior Ct. 194. On appellate review the evidence has always been appraised to determine whether it is sufficient to support the decree. *Schulz's Case*, 318 Pa. 110, 177 A. 798; *Arthur's Case*, supra; *In re Anna C. Brinton*, supra.

Recently the Supreme Court questioned not only the sufficiency of the evidence, but also weighed it. In

---

[1] See also *Denner v. Beyer*, supra, p. 390, where it was held: "If Mrs. Beyer should be decreed so mentally defective as to be incapable of managing her own property, this would raise a presumption of her incapacity, after the date of the decree, to make a will, and this could only be overcome by evidence of restoration of mental faculties or at least of a lucid interval. It is true that the decree of Mrs. Beyer's mental incompetency was made in this case subsequent to the will of October 9, 1944." There the interval between the execution of the will and the entry of the decree was 87 days; here it is only 7 days.

*Denner v. Beyer,* supra, p. 397,[2] the late Chief Justice said: "It is a serious thing to deprive any person of the control of their own property or of their right to dispose of it by will. This right will be judicially taken away from a person only after *preponderating proof* of his lack of mental capacity to manage his own business affairs." (Emphasis added.) Whether judged by the standard of evidential sufficiency or preponderating proof, the record does not support the instant decree, and it will be reversed.

The decree rests wholly upon the testimony of Dr. Francis C. Hartung, a general practitioner and Mrs. Owens' attending physician since 1940. He described her physical condition to which we have adverted. His testimony concerning her mental condition is fairly summarized in this excerpt: "My feeling is that this good lady, who has suffered the pangs of pain she has suffered for this length of time, for these years, has suffered in mind, so that she would be unable to carefully administer her property. *Now, I wish to state definitely that I do not consider this good woman feeble-minded,* but she is not able; she certainly is not able to administer her property." On cross-examination he testified: *"Mentally she is not defective.* That good woman can talk to you, and she can tell you—she can talk to you perfectly sensibly, but if it came to administering a property, I do not feel that she is strong enough to do that without guidance." (Emphasis added.) In response to the hearing judge's leading question: "She is apt to become the victim of designing persons because of her weakness?" the witness answered: "Absolutely." The context indi-

---

[2] Although the Act of May 28, 1907, P. L. 292, §8, as amended by the Act of April 15, 1915, P. L. 124, §2, 50 P.S. §964, provides that appeals from decrees adjudging persons feeble-minded shall be taken to the Superior Court, the *Denner* case was reviewed by the Supreme Court on a direct appeal from the Court of Common Pleas of Montgomery County. Nonetheless, it is a binding precedent.

cates that both judge and witness were referring to *physical* weakness.[3] Dr. Hartung's testimony established physical infirmities, but it was palpably insufficient to prove that Mrs. Owens was feeble-minded or mentally defective.

The definition provided by the Act, supra, a person who "shall become insane or feeble-minded or epileptic, or so *mentally* defective that he or she is unable to take care of his or her property, and in consequence thereof is liable to dissipate or lose the same", refers "only to *mental incapacity,* and not to incapacity resulting from purely *physical* infirmities": *McGuigan Est.,* 349 Pa. 581, 589, 37 A. 2d 717, which follows and cites *Bryden's Est.,* supra; *Hoffman's Est.,* supra; *Ryman's Case,* supra.

Opposed to his testimony was that of two psychiatrists, Doctors O'Brien and Johnson, who jointly examined her for an hour in the nursing home. Dr. O'Brien testified: "My opinion of her mental condition is that no mental illness exists, that she is of sound mind and competent," and that "the only abnormality was the limitation because of her physical condition." Dr. Johnson agreed with that diagnosis. Between them they testified to facts which have high significance. Mrs. Owens told them why she was in the home, the exact date of her admission, the correct telephone number in her home, and the date of her husband's death. She realized, she herself said, that their presence was due to the pending court proceeding; that she wanted "to remain in control of her own assets"; that "there had been considerable contention between the son and the daughter over a period of many years"; and in that connection re-

---

[3] The cross-examination immediately preceding the judge's question: "Q. That is what I am trying to find out, why you state she cannot take care of her estate in an experienced way. A. Because she is weak. She has gotten to the point now where she will do things in the way that will let her out easiest. She hasn't the strength to carry on alone."

vealed that the daughter "had been inconsiderate of her [respondent's] husband." The hearing judge rejected the testimony because the witnesses were young men, had spent only an hour with her, and were paid experts.[4] Their ages are not stated, but one was graduated from Jefferson Medical College in 1943, the other from Indiana University Medical School in 1941. There is no testimony that an examination for one hour was not an adequate predicate for a professional opinion. Indiscriminate rejection of remunerated expert testimony would distressingly embarrass courts in their search for truth. Still, there is no finding that their testimony was intrinsically incredible and we are not required to discredit it.

Even though their professional opinions were not accredited, the facts which the psychiatrists reported should have been considered. "One's mental capacity is best determined by his spoken words, his acts and conduct"; and the hearsay rule does not exclude statements made to third persons which exhibit the declarant's state of mind or his mental capacity. *Ryman's Case*, supra, p. 218. Her declarations, not only proved an awareness of the events occurring about her, but they rebutted her physician's testimony that she would "do things in the way that will let her out easiest." They explain her preference for her son in making her will and confiding the management of her property to him, and preferences are part of one's liberty. "If she has a fondness for some of them [children] greater than for the others because of their relations with her, such preference is natural and not indicative of impairment of mind." *In re Anna C. Brinton*, supra, p. 197. Furthermore, if as Mrs.

---

[4] The judge's comment: "These young men did not impress the Court very favorably, for their entire knowledge of the patient and her condition had been gained in an interview lasting for about one hour, and they had been engaged as experts to support the brother's position antagonistic to the proceedings."

Owens said, the daughter had been inconsiderate of her father, which the petitioner did not deny, her exclusion from the father's and respondent's will is understandable. Far from showing that she was apt to pursue the easiest way, her declarations clearly show that her memory and her power of volition were unimpaired, and that her mind was functioning normally. "Instead of exhibiting the vacillation characteristic of weakness of mind, she exhibited the decision characteristic of strength of mind": *Denner v. Beyer*, supra, p. 397.

The supervising nurse of the home testified to her physical condition. That portion of her testimony was accepted by the hearing judge but he ignored her opinion of her mental state. On that subject she testified that she always found Mrs. Owens "completely oriented", and is "completely normal in my opinion, as far as her reaction to everything that happens under our care." She reported that respondent had a delightful sense of humor, and was friendly with and considerate of "all the people in the home." She was corroborated by an assistant nurse who had immediate charge of Mrs. Owens. A lay witness may testify to the mental condition of a person when the facts upon which the opinion is based are stated. *Rouch v. Zehring*, 59 Pa. 74; *Dickinson v. Dickinson*, 61 Pa. 401.

The preponderance of the evidence is on the respondent's side, and it would flatly rebut Dr. Hartung's testimony if he had asserted that she was mentally defective.[5]

Neither the son nor the daughter testified concerning their mother's mental condition. The son testified about

---

[5] In *Denner v. Beyer*, supra, p. 395, the superintendent of the Norristown State Hospital testified that the respondent was weakminded, and *might* become the victim of designing persons. Nevertheless, the Supreme Court, considering *all* the evidence in the case, declared that the record contained no proof of mental incapacity and that "the proof strongly preponderates in favor of this respondent."

the father's estate and his management of it, and the circumstances in which the mother made her will. He was subjected to a gruelling cross-examination, but it shed no light upon the basic issue of his mother's mentality. Although his sister had no legal interest in her father's estate, the son might have avoided considerable trouble by a full and frank disclosure of its assets. However, no negligence or misappropriation was shown, and there is no testimony to support the judge's statement that he *"stealthily* managed, during the lifetime of his father but without the knowledge of his sister, to get into his own custody and control all of the property of his parents except the real estate, . . ."  (Emphasis added.)  So that the litigation which will inevitably ensue concerning the mother's will shall not be prejudged, we refrain from comment upon that subject. Critical stress has been laid upon his answer on cross-examination: "A. Well, I don't recall what time after dad died I explained to her that dad died. I said, 'Well, Mother, somebody will have to take care of your affairs. Who do you want to take care of them?' She said, 'You. You took care of things for dad. Won't you take care of them?' "[6] No testimony controverts that statement, and no condemning inference can be drawn from it. He was a co-executor of his father's will with his mother and she had the legal right to commit exclusive control of the estate to her son. She had the right to prefer her son over her daughter, even if her preference had rested upon an unfounded prejudice. *In re Anna C. Brinton,* supra. All that can be expected of an aged person is that

---

[6] Apparently the father's estate consisted largely, if not entirely, of his interest in securities and real estate held by himself and his wife as tenants by the entireties. The interest passed to respondent by the right of survivorship, and not under the will. The son seems to have had possession, or at least the management, of the securities during the last days of his father's life.

she shall select a competent agent to administer her business affairs. *Bryden's Est.*, supra.

Decree reversed at appellee's costs.