## Hudak Appeal.

Argued September 27, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ. (GUNTHER, J., absent).

*Paul A. McGlone,* with him *Frank J. McDonnell,* for appellant.

*Ralph P. Needle,* with him *Joseph S. Needle* and *Needle, Needle & Needle,* for appellee.

OPINION BY DITHRICH, J., November 15, 1951:

On petition of Irene and Edward Hudak a guardian was appointed for the estate of their mother, Anna Hudak, whom the court below decreed to be "without mental capacity to take care of her property" within the meaning of the Act of May 28, 1907, P. L. 292, 50 PS §941 et seq. Respondent filed exceptions to the decree; the exceptions were dismissed and this appeal followed.

After a comprehensive and painstaking review of the record in this case, we can reach no other conclusion than that the learned court below failed to give due regard to the admonition by the late Chief Justice MAXEY that "It is a serious thing to deprive any person of the control of their own property or of their right to dispose of it by will. This right will be judicially taken away from a person only after *preponderating* proof of his lack of mental capacity to manage his own business affairs" (emphasis added): *Denner v. Beyer,* 352 Pa. 386, 397, 42 A. 2d 747. We cannot help but feel that if the learned court below had given proper heed to that warning it would not have found "preponderating proof that she [respondent] is lacking in mental capacity to manage her own business affairs"; but, to the contrary, would have found, as the Supreme Court found in *Denner v. Beyer,* supra (p. 397), that "There is no such proof in this record. In fact, the proof strongly preponderates in favor of this respondent."

The most that can be said of petitioners' evidence, coupled with the admissions of respondent, is that for several years during the lifetime of her husband respondent was excessively jealous of him and suffered hallucinations and delusions in respect of his relationship with other women. But according to the refreshingly frank and straightforward testimony of Michael J. Hudak, one of the sons, his mother had good reason to be jealous of his father. Michael testified that his father "was gay with women" the same as was he, the son, a "man of the road" and a "salesman all . . . [his] life. . . . She was jealous, yes, always has been jealous, and she had a reason to be jealous . . ."

The most enlightening medical testimony in the case was that of Dr. F. H. Leavitt, a "nationally known" psychiatrist of Philadelphia. Seven physicians in all testified—four for the petitioners and three for the respondent—and the reason we say that Dr. Leavitt's tes-

timony was the most enlightening is not only because he was so eminently qualified to form and express an opinion but because he was the only psychiatrist whose testimony went directly to the condition of the respondent at the time of trial. Since November 27, 1950, a few days following the death of respondent's husband, she had been making her home with her son Francis in Philadelphia. She was examined there by Dr. Leavitt on December 8, 1950, and in Scranton on December 26, the day he testified. With the exception of Dr. Killeen, a surgeon with considerable psychiatric experience, who has known respondent for years and who examined her December 14, the day before the beginning of the trial, none of the other physicians had examined her for more than a year prior thereto. "The point to be decided was the mental condition of [respondent] *at the time of trial,* with respect to [her] ability to take care of [her] property, and whether [she] is liable to dissipate or lose the same and become the victim of designing persons": *Ryman's Case,* 139 Pa. Superior Ct. 212, 216, 11 A. 2d 677; *Nagy Appeal,* 169 Pa. Superior Ct. 388, 390, 82 A. 2d 591.

The gist of the medical testimony offered by petitioners was that since respondent had been suffering from paranoid psychosis or paranoic schizophrenia—a comparatively recent terminology for the same affliction—when they examined or treated her, she could not be expected ever to completely recover from what the trial judge referred to as her "underlying infirmity."

Dr. Leavitt and Dr. Killeen, the only physicians who had examined respondent anywhere near the time of trial, testified that mentally respondent was normal in every respect and in no sense likely to become the victim of designing persons. Physically she was suffering from hypertension and a cardiovascular condition that in no way affected her mentality. Cf. *Owens Ap-*

*peal,* 167 Pa. Superior Ct. 10, 74 A. 2d 705. However, in respect of their testimony the trial judge said: "Obviously these expert witnesses were not in possession of *all* the facts respecting the respondent's conduct when they arrived at the conclusions they testified to and the probative force of their opinions must be so evaluated in weighing their testimony." (Emphasis added.) They may not have been in possession of *all* the facts, but in our opinion they were in possession of sufficient facts to enable them to form and express an intelligent and competent opinion of respondent's mental capacity. In any event it cannot reasonably be said that the preponderance of the medical testimony was on the side of the petitioners.

In respect of the testimony of two sisters of respondent and three of her sons the trial judge said: "This testimony is of little or no value." As pointed out by RENO, J., in *Owens Appeal,* supra (p. 13): "Recently the Supreme Court questioned not only the sufficiency of the evidence, but also weighed it." See *Denner v. Beyer,* supra (p. 397).

When the testimony of the lay witnesses for respondent is weighed against the testimony of Irene, the only lay witness for the petitioners—her brother Edward did not testify—it greatly affects her credibility as a witness. For example, she testified and the trial judge found that "For over twenty-five years the respondent accused each child, in turn, of wrongdoing as a result of which each left the family home . . . at an early age." That statement was refuted by Joseph, aged 47 and the oldest child, who testified that he did not leave home until he was 21, when he left to get married. When asked, "Were you driven out by your mother?" he answered, "No. I wasn't driven out by my mother. It was my father who did the driving." He further testified that two weeks before the trial he took his mother into his own home for a week in order to

be able to observe her conduct and "to find out what it is all about." He was of the opinion that she was "very capable in handling her own affairs."

The statement was further refuted by Francis, the son with whom the respondent went to live following the death of her husband. He testified that he did not leave home until he was 22. He was then "studying for the priesthood of the Scranton diocese" and had received his A. B. degree at St. Mary's Seminary, Baltimore, Maryland. He was at home in the summer of 1940 when he received a telegram, purporting to be from an employment agency, offering him a job in Philadelphia. He later found out that it was not from the agency but from his brother Edward, one of the petitioners in this case, who said it offered Francis "the opportunity to get away from home and get to work." When asked if he thought his mother was "mentally capable of handling her own affairs," he answered, "Very much so." And it was still further refuted by Michael, the "man of the road," aged 42, who testified that he left home of his "own free will" when he was 16 because his father, who was a "Very, very strict" man, was waiting for him with a cat-o'-nine-tails one night when he was late in getting home. When asked if his mother was the cause of his leaving he answered, "Absolutely not." Michael further testified, and his testimony was corroborated by other members of the family, that although Irene and Edward had arranged to have respondent committed to Clarks Summit State Hospital, also known as Hillside State Hospital, on November 8, 1949, the very day she attended the funeral of his (Michael's) son, nothing was said to him or the other members of the family about the commitment. She was committed to Hillside on November 8 and on November 20 Irene wrote the superintendent of the hospital, stating that her father had received two letters from her mother which had upset him "to

the point of breaking down(?)" and asking that no more letters be permitted to be sent out to him at least for several months and that he be denied the privilege of seeing his wife as he had planned to do on Tuesday, November 22. She repeatedly denied having written the letter until after it had been admitted in evidence and she had been confronted with her signature thereto.

Veronica Dragon, a registered nurse and a sister of respondent, talked with her and her husband at the grandson's funeral the day respondent was committed to Hillside. She likewise knew nothing of the commitment until later. She further testified that she had nursed many irrational patients and that she saw nothing irrational about her sister. Her condition was the same when the witness saw her at her husband's wake and funeral about a year after the funeral of her grandson. On that occasion Irene told the witness that she hated her mother and always had.

In his opinion the learned trial judge said: "The accusations and persecutions of her husband growing out of her hallucinations and delusions continued until his death on November 21, 1950. . . . At her husband's funeral she transferred the persecution complex to her daughter Irene and son Edward under the delusion that they robbed her while she was in the Clarks Summit State Hospital." In view of the testimony that Irene and Edward were instrumental in having the beneficiary changed from respondent to Irene in a policy of life insurance for $5,000 and from respondent to Edward in a policy for $2,000 while she was a patient in Hillside, her feeling that they had taken advantage of her may not have been the "delusion" that the learned court held it to be. That she is not likely to dissipate her property is evidenced by her handling of the $2,000 policy after Edward had been made the beneficiary and had been given possession of the policy by his father. He wanted to borrow an additional $1,000

to pay on a property he was buying. At first the father was for letting him have the money without any security, but when respondent objected she testified that her husband told Edward, " 'We're not going to give you the money because we haven't got anything . . . to protect us . . . mother will give you the money and you turn over the policy.' . . . He didn't want it that way.'' He wanted the money without surrendering the policy. However, he finally came to his mother's terms but she then made him wait until after July 1, the date when interest on her bank deposit was due. On the third of July she got a certified check and gave it to him and he then surrendered the policy.

To conclude, we are of opinion that the learned court below did not give due and proper consideration to the fact that the improvement in her behavior following the death of her husband was due to the removal of the object of her delusions and the change in her environment. The evidence preponderates that she has recently shown a definite improvement, and in the language of the Supreme Court in *Denner v. Beyer,* supra (p. 397), "If later she exhibits such feeble-mindedness or mental defectiveness as is likely to result in the dissipation or loss of her property, the courts are open for appropriate proceedings. On this record the decree appealed from is unwarranted."

The decree is reversed at the cost of the appellees.