Laura Mae DEFFENBAUGH *v.* ESTATE OF William Hershel
CLAPHAN and Estate of Lena May Claphan

CA 94-101 893 S.W.2d 350

Court of Appeals of Arkansas
Division I
Opinion delivered March 1, 1995

209

*Sam Sexton III*, for appellant.

*Gary R. Cottrell,* for appellee.

JOHN B. ROBBINS, Judge. Appellant, Laura Deffenbaugh, appeals from a decree of the Crawford County Probate Court, which refused to appoint guardians for the persons and the estates of her parents, appellees William Claphan and Lena Mae Claphan. We affirm the portion of the probate court's order denying the appointment of a guardian for Mr. Claphan but reverse and remand as to Mrs. Claphan.

Appellant is the daughter of appellees, William and Lena Mae Claphan. In 1993, she filed a petition requesting that she be appointed guardian of the persons and the estates of her parents, whom she alleged were incapacitated and unable to meet the

essential requirements for their health or safety or to manage their estate. Appellees' response denied that a guardian was necessary but further pled that, if the court should find either of the appellees to be incompetent, another family member should be appointed as guardian. After a hearing on the matter, the court made the following findings:

> 1. That the court has serious concerns for the financial well-being of William Herschel Claphan and suggests that a conservatorship would be in the best interest of William Herschel Claphan. However, William Herschel Claphan is not an incapacitated person.

> 2. That Lena Mae Claphan is clearly an incapacitated person, but William Herschel Claphan is able to provide for her care. Therefore, the request that petitioner be appointed her guardian is denied.

Because the probate court found that appellee Mrs. Claphan is clearly incapacitated, we agree with appellant that the probate court erred in refusing to appoint a guardian for her person and estate. Arkansas Code Annotated § 28-65-213(c)(3) (1987) provides that "[i]f it is found that the respondent is substantially without capacity to care for himself or his estate, a guardian for the person, estate, or both shall be appointed." At the beginning of the hearing on appellant's petition, the parties stipulated that appellee Lena Mae Claphan was incompetent. Furthermore, Dr. Charles Jennings, a physician specializing in internal medicine, testified that he has seen Mrs. Claphan on a regular basis since 1987 and that she suffers from severe organic brain syndrome, which poses a risk to her health and safety.

Appellant also contends that the probate court erred in not appointing a guardian for her father, Mr. Claphan. She argues that the probate judge found Mr. Claphan was easily influenced and the undisputed evidence shows that Mr. Claphan has been victimized by his grandson, Roger. She argues that Roger's influence, coupled with Mr. Claphan's failure to remember the power of attorney he executed in 1989 or the contents of his will clearly demonstrates that Mr. Claphan is unable to understand his actions and manage his estate and therefore justifies the appointment of a guardian on his behalf.

In support of her contentions, appellant testified that, in 1991, she discovered that thirty-eight blank checks had been stolen from her father and that, over a one-year period, her deceased brother's son, Roger, had written these checks to himself in an amount totaling $20,458.00. She stated that her father had to press criminal charges against Roger in order to collect this money from the bank and that he was able to collect only $9,000.00. She stated that, because of this loss, she had to cosign a note with her father in March 1991 so that he could obtain money to feed his cattle. She also testified that, after a discussion with Roger's family members, her father had revoked a power of attorney he had given her in 1989 and that, in 1993, her parents had deeded their home to Roger and his sister, reserving in themselves a life estate. She stated that she is concerned that Roger may steal from her father as he did before and that she is trying to protect her parents' assets. She also testified that her father's health has gotten progressively worse and that he frequently stumbles and falls. She stated: "He is much more uncooperative with me today than he was a year ago." She also testified that her father cannot look up a telephone number, her mother cannot dial a telephone, and they cannot really provide for themselves.

Dr. Jennings testified that he first saw Mr. Claphan in July 1991 and last saw him in June 1993. Dr. Jennings testified that he had some concern that Mr. Claphan is not adequately able to take care of his wife, that appellees were not able to manage their financial affairs, and that they were getting to the point that they could not manage their health affairs. He admitted, however, that his assessment of Mr. Claphan was based 90% upon the history that was provided to him by appellant and that he could not have formed his opinion regarding Mr. Claphan without appellant's statements.

Appellee William Claphan testified that he is eighty-one and will be eighty-two the first day of the following month. He was able to name the date and the day of the week, his address, when he was married, and the president of the United States. He testified that he has worked on a farm for the past ten years; that he worked at Riverside Furniture prior to that; that he receives $77.00 per month in retirement income; and that he and his wife together receive about $800.00 a month in social security. He

stated that, when he discovered that his grandson, Roger, had forged his checks, he discussed the matter with him and that Roger offered to get a loan to repay him. He stated that he did not want to prosecute Roger but that appellant and the bank had insisted on it. He also stated that Roger helps him around the farm, that he did not know how he would manage without Roger's help, and that he pays Roger minimum wages whenever he does help. He also testified that he goes through the canceled checks he receives from the bank.

In reference to the deed to their house, reserving a life estate, that Mr. and Mrs. Claphan had given Roger and Roger's sister, he explained that Roger and Barbara wanted to keep the house in the family; that he knew he and his wife would be able to stay in the house until they died; and that, if he wanted to sell the property, Roger and Barbara would help him convey it. He stated that he understood that Roger and Barbara would have to sign an instrument in order for him to sell the house; however, on examination by the court, he admitted he was not real sure of the purpose of the deed that he signed. He also did not remember that a will he executed in 1989 left everything to appellant; he thought it went to appellant and "the boys." He also testified that he did not remember giving appellant his power of attorney and, when he discovered it a year ago, he had it revoked because Roger and Roger's relatives told him that the power of attorney would allow her to do whatever she wanted with his property. He testified that he did not think he needed a guardian, that he could take care of his own business, and that appellant has tried to boss them around "like we were kids."

Gene Neidecker testified that he has known Mr. Claphan since 1990 when Mr. Claphan purchased a bull from him. He stated that Mr. Claphan knew the kind of bull he wanted, that he picked out a good bull and paid a fair price for it, and that he purchased a second bull from him 1992. He stated there was not anything about the transaction that caused him to have doubts about Mr. Claphan's ability to handle his own affairs.

At the conclusion of the hearing, the probate judge stated that Mr. Claphan had forgotten some things but that his memory was very sharp on other things and that Mr. Claphan was very apprehensive about his welfare and his old age. He stated that deter-

mining whether Mr. Claphan was incompetent was a very close question but that he found Mr. Claphan to be competent, although easily influenced and easily upset, and that he wished Mr. Claphan would get a bank to serve as his conservator or to advise him. He concluded that, while he thought Mr. Claphan needed a conservator, he did not find him lacking sufficient understanding or capacity to make or communicate decisions to meet the essential requirements for his health or safety or manage his estate.

Arkansas Code Annotated § 28-65-201(a) (1987) provides that "[a] guardian of the estate may be appointed for any incapacitated person." Arkansas Code Annotated § 28-65-101 (1987) provides the following relevant definitions:

> (1) "Incapacitated person" means a person who is impaired by reason of a disability such as mental illness, mental deficiency, physical illness, chronic use of drugs, or chronic intoxication, to the extent of lacking sufficient understanding or capacity to make or communicate decisions to meet the essential requirements for his health or safety or to manage his estate. . . .
>
> . . . .
>
> (10) "Essential requirements for health or safety" means the health care, food, shelter, clothing, and protection without which serious illness or serious physical injury will occur.

Arkansas Code Annotated § 28-65-213 (1987) further provides:

> (b) The burden of proof by clear and convincing evidence is upon the petitioner, and a determination of incapacity shall be made before consideration of a proper disposition.
>
> (c)(1) If the respondent is found to be incapacitated, the court shall determine the extent of the incapacity and the feasibility of less restrictive alternatives to guardianship to meet the needs of the respondent.
>
> (2) If it is found that alternatives to guardianship are feasible and adequate to meet the needs of the respondent, the court may dismiss the action.

A probate court's finding of incapacity involves a finding of fact, and the appellate court will not reverse such a finding unless it is clearly against the preponderance of the evidence or clearly erroneous. *In the Matter of Bailey*, 299 Ark. 352, 355, 771 S.W.2d 779, 781 (1989). Earlier Arkansas cases described the test for competency as follows:

> As a general rule, it may be stated that, in order to have that measure of capacity required by law to be of sound mind, a person must have capacity enough to comprehend and understand the nature and effect of the business he is doing; and where it is clearly made to appear that the mental incapacity and imbecility is of such a degree as to render the person unable to conduct the ordinary affairs of life and leaves him in a condition to be the victim of his infirmity, then such person is in contemplation of law not of sound mind. Weakness of understanding is not alone sufficient to show mental unsoundness if capacity remains to see things in their true relations and where the individual has a moderate comprehension of his immediate duties and of the value and use of his property." Reaffirmed in many subsequent decisions, among the latest being that of *Kelley* v. *Davis*, 216 Ark. 828, 227 S.W.2d 637.

*Dew* v. *Requa*, 218 Ark. 911, 915, 239 S.W.2d 603, 606 (1951) (quoting *Pulaski County* v. *Hill*, 97 Ark. 450, 134 S.W. 973, 975 (1911)); *Powers* v. *Chisman*, 217 Ark. 508, 511, 231 S.W.2d 598, 599 (1950).

> While it is difficult to state the test applied by the courts more precisely, it is clear that no very high standard of competence is to be exacted; mere lack of good business sense not amounting to some degree of mental incompetency is ordinarily not regarded as sufficient to require guardianship. Nor does susceptibility to influence justify the appointment of a guardian, if the alleged incompetent possesses capacity to manage his property as a result of sanative reasoning, although a contrary rule prevails if, in the disposition of his property, he is guided by the will of others, rather than his own. The unsoundness of mind which will justify an appointment must be more than mere debility or impairment of memory; though loss of memory may,

of course, be a factor in determining whether a person has competence to manage his estate.

> Competency at the time of the proceeding for appointment of the guardian is the subject of inquiry. A possibility of future incompetency is not sufficient.

39 Am. Jur. 2d *Guardians and Wards* § 20 at 22-23 (1968).

 Here, there was evidence that Mr. Claphan continues to farm, that he pays his grandson to help him with farming, and that he has watched his checks and checkbooks since his checks were stolen. The burden was on the appellant to prove by clear and convincing evidence that appellee Mr. Claphan was no longer able to handle his affairs, and the court below had the benefit of not only hearing and observing the witnesses, but more importantly, it had the opportunity to hear and observe Mr. Claphan. We therefore cannot say that the court's finding that Mr. Claphan was not mentally incapacitated is clearly erroneous.

> Mental capacity and competency are to be presumed and before any person shall be deprived of the right to handle his or her own property and manage his or her own affairs there must be *clear* and *convincing* proof of mental incompetency and such proof must be *preponderating.*
>
> . . . . Proof of mental incompetency must possess such strength and clarity as to lead incontestably to but one conclusion, to wit, that respondent is mentally incompetent. A finding of mental incompetency is not to be sustained simply if there is *any* evidence of such incompetency but only where the evidence is preponderating and points unerringly to mental incompetency.

*In re Estate of Myers*, 395 Pa. 459, 150 A.2d 525, 526-27 (1959) (citations omitted).

It is probable that, within the near future, Mr. Claphan may be incapacitated and require the appointment of a guardian for himself; however, the court must act on his capacity at the time of trial. Accordingly, the decree is affirmed as to Mr. Claphan. As to Mrs. Claphan, the decree is reversed and remanded with instructions that a guardian be appointed for her person and estate.

Affirmed in part; reversed and remanded in part.

MAYFIELD and ROGERS, JJ., agree.