J-A06032-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: GERALD A. COLEMAN, JR. AN INCAPACITATED PERSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: GERALD A. COLEMAN, JR. | No. 2226 EDA 2014 |

Appeal from the Decree of June 17, 2014
In the Court of Common Pleas of Lehigh County
Orphans' Court at No(s): 2013-1734

BEFORE:  PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED MARCH 30, 2015**

Gerald Coleman, Jr. ("Appellant") appeals from the decree entered in the Court of Common Pleas of Lehigh County, Orphans' Court Division, adjudicating him to be an incapacitated person and appointing a plenary guardian of his person and estate.  After careful review, we affirm.

The trial court aptly set forth the pertinent factual and procedural history as follows:

> On November 14, 2013, Gerald A. Coleman, III, a medical doctor Board-certified in emergency medicine ("Dr. Coleman"), filed a Petition for Appointment of Emergency Guardian of the Person and Estate for his father, Mr. Coleman, and his mother, Mrs. Coleman.

> With respect to Mr. Coleman, the petition alleged he was 74 years of age and married; had recently been discharged from Lehigh Center, an assisted living facility, and had returned to his personal residence against the recommendation of medical professionals that he reside in an assisted living facility; that he had fired all medical personnel that had been hired to assist him while at home; had refused to relinquish his driver's license despite such advice from several medical professionals; and was

unable to control his anger when medical personnel and family tried to assist him. The petition contained a note from Dr. Todd Holbrook ("Dr. Holbrook") to the effect Mr. Coleman was not capable of making and understanding the consequences of decisions. It also contained a letter dated November 6, 2013, from Dr. Darryl Jackson, Medical Director of Lehigh Center, stating Mr. Coleman suffered from Parkinson's induced dementia, was evasive with details and was impaired to make his own decisions.

. . .

A hearing on the emergency petitions was held on November 22, 2013. Mr. Coleman appeared mid-way through it; it is not clear from the record whether Mrs. Coleman appeared at that time.

With regard to Mr. Coleman, Dr. Holbrook, a medical doctor who is Board-certified in family medicine, testified he had treated Mr. Coleman since July 17, 2013, and last saw him on October 17, 2013. N.T. 11/22/13 at 22. He diagnosed Mr. Coleman as having a super nuclear palsy, a progressive disease with Parkinson-like symptoms. *Id.* He said Mr. Coleman became agitated and angry quickly; could not formulate reasonable decisions with regard to his health, safety, financial transactions, or medical needs, including giving informed consent for a medical or surgical procedure; could be taken advantage of by unscrupulous persons; could not take his medications safely; and had poor memory. *Id.* at 22-26. He also said Mr. and Mrs. Coleman engage in a lot of yelling with each other and do not quite understand the full severity of their medical condition or problems. *Id.* at 23. When presented with the statutory definition of an incapacitated person, Dr. Holbrook believed Mr. Coleman met that definition and probably required placement in a nursing center or, at a minimum, an assisted living facility. *Id.* at 26-27.

Mr. Coleman testified on his own behalf. He stated accurately that he had been the chief financial officer for CBS, a major New York Stock Exchange company. He also admitted he drove his automobile to the hearing even though his driver's license had been suspended by PennDOT on the basis of information it received about his neurological or psychiatric condition. When asked about his license, he was confused and self-contradictory. *Id.* at 39-43.

- 2 -

. . .

By order of November 22, 2013, Dr. Coleman was appointed emergency guardian of the person and estate for each of his parents. He filed a petition for determination of incapacity and appointment of a plenary guardian of the person and estate for each of his parents pursuant to 20 Pa.C.S.[] § 5501 et seq., on December 10, 2013. On the following day, December 11, 2013, privately-retained counsel filed her appearance on behalf of Mr. Coleman and a motion to appoint a substitute emergency guardian of the person and estate and a guardian ad litem for Mr. Coleman, and to arrange for an independent evaluation of him. By orders of December 16, 2013, the court appointed Helen Stauffer, Esquire, guardian ad litem for Mr. Coleman; ordered his counsel obtain a medical evaluation of Mr. Coleman by a qualified physician of counsel's choosing who would also be acceptable to the guardian ad litem; appointed Shannon Piergallini Smith, Esquire, guardian ad litem for Mrs. Coleman; and scheduled a hearing in each matter for March 4, 2014. By order of January 27, 2014, Mrs. Coleman's guardian ad litem was authorized to arrange for Mrs. Coleman to be evaluated by any living/personal care facility selected by her guardian ad litem to determine Mrs. Coleman's suitability for placement in such level of care.

Dr. Coleman subsequently resigned as emergency guardian of the estate and person for his parents. By order of February 14, 2014, Attorney David Roth was appointed to succeed Dr. Coleman as emergency guardian of the estate of Mr. Coleman and emergency guardian of the estate and person of Mrs. Coleman. As noted in the footnote to that order, no appointment of a successor emergency guardian of the person for Mr. Coleman was made since he appeared to be cooperating with his counsel and his guardian ad litem remained in place. By orders dated March 19, and filed on March 24, 2014, the hearing on the § 5511 petition was continued to June 9, 2014; Attorney Stauffer's motion to be discharged as guardian ad litem for Mr. Coleman was granted; and Mrs. Coleman's guardian ad litem was instructed to arrange for a qualified expert to evaluate her.

On May 22, 2014, counsel was appointed for Mrs. Coleman upon the request of her guardian ad litem. The final hearing on the §5511 petitions was held on June 9, 2014. Mr. Coleman attended with his privately retained counsel; Mrs. Coleman

attended with her court-appointed counsel and her court-appointed guardian ad litem.

With regard to Mr. Coleman, Dr. Susan Ingram, a clinical neuropsychologist who was retained by his counsel to evaluate Mr. Coleman's cognitive functioning, testified she evaluated him on January 7 and 10, 2014. She found his memory in formal testing to be impaired "in some respects," and his long term memory poor if he was not given enough time to process information. N.T. 6/9/14 at 65-66. He made several math errors when working with decimals and fractions, but, she said, was still within a range of most people. *Id.* at 67. She did not assess whether he could formulate decisions concerning his physical health and safety. *Id.* at 68. She concluded he had "very mild" dementia secondary to Parkinson's disease. *Id.* at 69. She felt Mr. Coleman could make a responsible decision regarding his medical and surgical treatment, but also stated he was prone to making "more errors, and poor judgments." *Id.* at 71. She did not assess whether he could make responsible decisions regarding financial transactions or whether he was able to live independently. *Id.* at 71-72. She was clear that he should not drive. *Id.* at 67. She also said she believed he could "properly function by himself without ongoing monitoring, without that ongoing treatment," although she acknowledged she did not assess him outside of her office. *Id.* at 67, 72. When asked whether her report indicated "that Mr. Coleman needs a guardian at this time," she replied "I can't say. I didn't evaluate anything other than the cognitive functioning within my testing." *Id.* at 75.

Attorney Roth, Mr. Coleman's court-appointed emergency guardian of his estate, also testified. He said that although Mr. Coleman had been what Mr. Roth described as the controller of a division of CBS, his finances were "disheveled, and starting to come apart." *Id.* at 80. He also said Mr. Coleman complained to him that his garbage had not been collected, although Mr. Coleman could not remember the name of the private company he used so that it could be contacted to address the matter, and that Mr. Coleman was confused about whether he had paid his real estate taxes and medical bills. *Id.* at 79-80.

Mr. Roth also testified that Mr. Coleman lived at home and received about six hours of services each week day. He has fallen and was hospitalized at least six times since February. One time his alert button went off, the police responded, [but]

- 4 -

he could not get up to answer the door so the police kicked it in, and Mr. Coleman refused medical treatment and threatened the police. It turned out he had pneumonia. *Id.* at 81. Another time after a fall in his house and being hospitalized Mr. Coleman agreed to 24-hour care, but canceled it the very next day. *Id.* at 82. At times he has refused to admit his home health aid[e]s entry to his house. He called Mr. Roth daily to report his toilet was overflowing and "there was water everywhere." Upon arriving at Mr. Coleman's residence, Mr. Roth said "there was no water anywhere . . . the toilet just needed to be jiggled." *Id.* at 83-84.

Mr. Roth described Mr. Coleman as cooperative, polite, courteous and rational at times, and completely irrational, inappropriate and aggressive at other times. *Id.* at 84. He believed Mr. Coleman could not manage his financial affairs or manage his own medical care or be safe "in any respect whatsoever" without assistance. *Id.* at 86.

Finally, Mr. Coleman testified. There was nothing about his demeanor or answers that supported a finding he was capable of managing his own financial affairs or making decisions; on the contrary, he provided every indication he was incapable of managing his own affairs or otherwise making any such decisions.

Trial Court Pa.R.A.P. 1925(a) Opinion, filed September 30, 2014, at 2-8 (footnote omitted).

On June 17, 2014, the trial court entered a final decree adjudicating Appellant to be an incapacitated person and appointing a plenary guardian of his person and estate. Appellant timely appealed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issue for review:

I. Whether the lower court abused its discretion and committed an error of law in determining that Appellant is incompetent and in appointing a guardian of the person and a guardian of the estate?

- 5 -

Appellant's Brief, p. 6 (all capitals removed).

"The appointment of a guardian lies within the discretion of the trial court and will be overturned only upon an abuse of discretion." *In re Duran*, 769 A.2d 497, 506 (Pa.Super.2001) (citing *Estate of Haertsch*, 649 A.2d 719, 720 (Pa.Super.1994)). This Court will find an abuse of discretion only where "the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Id.* (quoting *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1123 (Pa.2000)).

An "'[i]ncapacitated person' means an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501. A court may appoint a guardian "only '[u]pon a finding that the person is partially incapacitated and in need of guardianship services,'" or "upon a finding that the person is totally incapacitated and in need of plenary guardianship services[.]" *In re Peery*, 727 A.2d 539, 540 (Pa.1999) (citing 20 Pa.C.S. § 5512.1(b)-(c)) (emphasis deleted). A person is presumed to be mentally competent and a petitioner seeking guardianship must establish incapacity by clear and convincing evidence. *In re Hyman*, 811 A.2d 605, 608 (Pa.Super.2002). "A finding of mental incompetency is not to be sustained simply if there is any evidence of such incompetency but only where the evidence is

preponderating and points unerringly to mental incompetency." *Id.* (quoting

*In Re Myers' Estate*, 150 A.2d 525, 527 (Pa.1959)). This Court has noted

"[a] statute of this nature places a great power in the court. The court has

the power to place total control of a person's affairs in the hands of another.

This great power creates the opportunity for great abuse." *Id.* (quoting

*Estate of Haertsch*, 609 A.2d 1384, 1386 (Pa.Super.1992)).

Appellant challenges the weight of the evidence. *See* Appellant's

Brief, pp. 10-17. In short, Appellant claims Dr. Susan Ingram provided the

only medical testimony, that she testified Mr. Coleman was capable of

looking after himself with a little help 6-8 hours a day, and that the trial

court ignored this evidence without satisfactorily explaining its reasons in the

decree or the 1925(a) Opinion.[1] *Id.* Appellant is incorrect.

The trial court considered Dr. Ingram's testimony and discussed it in

its opinion. *See* 1925(a) Opinion, pp. 6-7. The trial court ultimately

determined:

> Little weight was accorded to the testimony of Dr. Ingram, who
> evaluated Mr. Coleman[.] . . . Dr. Ingram's testimony was of
> little help or credibility; it was self-contradictory, confusing and
> unsubstantiated. She said Mr. Coleman had mild dementia and

---

[1] Appellant also suggests that the trial court placed too much weight on its assessment of Appellant's testimony. *See* Appellant's Brief, p. 12. Appellant does not elaborate on this argument in his brief. Additionally, we may not substitute our judgment for that of the trial court, which had the opportunity to observe Appellant testify. *See In re Hyman*, 811 A.2d at 609 ("[w]e will not substitute our judgment for that of the lower court absent a clear abuse of discretion [.]").

was prone to making errors and poor judgments, and she acknowledged she did not assess whether he could formulate decisions concerning his physical health and safety, yet she nonetheless concluded he could make a responsible decision regarding his medical and surgical treatment. She also admitted she did not assess whether he could live independently and did not assess him outside of her office, yet she concluded he could "properly function by himself." And, finally, when asked whether she thought Mr. Coleman needed a guardian she replied "I can't say. I didn't evaluate anything other than the cognitive functioning with my testing."

1925(a) Opinion, pp. 12-13.

Additionally, Appellant incorrectly suggests that Dr. Ingram provided the only medical testimony in this matter. This allegation completely ignores the November 22, 2013 testimony of Dr. Todd Holbrook, which the trial court considered and discussed. *See* 1925(a) Opinion, pp. 3-5. The trial court summarized Dr. Holbrook's testimony as to Mr. Coleman as follows:

With regard to Mr. Coleman, Dr. Holbrook, a medical doctor who is Board-certified in family medicine, testified he had treated Mr. Coleman since July 17, 2013, and last saw him on October 17, 2013. N.T. 11/22/13 at 22. He diagnosed Mr. Coleman as having a super nuclear palsy, a progressive disease with Parkinson-like symptoms. *Id.* He said Mr. Coleman became agitated and angry quickly; could not formulate reasonable decisions with regard to his health, safety, financial transactions, or medical needs, including giving informed consent for a medical or surgical procedure; could be taken advantage of by unscrupulous persons; could not take his medications safely; and had poor memory. *Id.* at 22-26. He also said Mr. and Mrs. Coleman engage in a lot of yelling with each other and do not quite understand the full severity of their medical condition or problems. *Id.* at 23. When presented with the statutory definition of an incapacitated person, Dr. Holbrook believed Mr. Coleman met that definition and probably required placement in a nursing center or, at a minimum, an assisted living facility. *Id.* at 26-27.

1925(a) Opinion, p. 4.

In addition to this medical testimony, the trial court considered the testimony of the court-appointed guardian, Attorney Roth, and Appellant himself in rendering its decision. In the trial court's eyes, the testimony of both Attorney Roth and Appellant supported its conclusion that Appellant requires a guardian. This Court will not substitute its judgment for the lower court. **See In re Hyman**, 811 A.2d at 609 ("[w]e will not substitute our judgment for that of the lower court absent a clear abuse of discretion [.]").

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/30/2015