J-A06033-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: MARGARET A. COLEMAN, AN INCAPACITATED PERSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF MARGARET A. COLEMAN | No. 2132 EDA 2014 |

Appeal from the Decree of June 17, 2014
In the Court of Common Pleas of Lehigh County
Orphans' Court at No(s): 2013-1735

BEFORE: PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                    **FILED MARCH 30, 2015**

Margaret Coleman ("Appellant") appeals from the decree entered in the Court of Common Pleas of Lehigh County, Orphans' Court Division, adjudicating her to be an incapacitated person and appointing a plenary guardian of her person and estate. After careful review, we affirm.

The trial court aptly set forth the pertinent factual and procedural history as follows:

> On November 14, 2013, Gerald A. Coleman, III, a medical doctor Board-certified in emergency medicine ("Dr. Coleman"), filed a Petition for Appointment of Emergency Guardian of the Person and Estate for his father, Mr. Coleman, and his mother, Mrs. Coleman.
>
> . . .
>
> With respect to Mrs. Coleman, the petition alleged she was 71 years of age and married; had recently been discharged from Lehigh Center and returned to her personal residence against the recommendation of medical professionals that she reside in an assisted living facility; that her husband, Mr. Coleman, had fired all medical personnel that had been hired to assist her while at

home and she was unable to hire her own medical personnel; that she suffered from alcohol abuse; that she refused to relinquish her driver's license despite several crashes of a vehicle on her own property; that she was under the control of her husband; and that she had been admitted to the hospital on November 10, 2013, for injuries sustained from an alcohol-related fall and remained hospitalized. The petition contained a note from Dr. Holbrook to the effect Mrs. Coleman was not capable of making decisions and understanding the consequences of decisions.

A hearing on the emergency petitions was held on November 22, 2013. Mr. Coleman appeared mid-way through it; it is not clear from the record whether Mrs. Coleman appeared at that time.

. . .

With regard to Mrs. Coleman, at the time of the hearing she was a patient in the Lehigh Valley Hospital for the previous four days. Dr. Mohammed Fawwad Khan, a medical doctor who is Board-certified in internal medicine and specializes in hospital medicine, was her attending physician during that time and had treated her on two other occasions during other hospitalizations. In fact, he testified Mrs. Coleman had been admitted to the hospital about six times over the previous twelve months. He testified she carried diagnoses of cognitive dysfunction not otherwise specified, major depressive disorder and ongoing alcohol abuse, and she lacked the capacity to make adequate decisions for herself with regard to her physical health and safety, including her medical needs, and her financial affairs. [N.T. 11/22/13] at 10-11, 15. He said she did not understand the medical effects of alcohol; was noncompliant with her medications; could not consent to a medical or surgical procedure; had poor memory; repeated questions; and had diminished concentration. *Id.* at 10, 13, 15-16. He said she could possibly be taken advantage of by unscrupulous persons. *Id.* at 12. He reported she scored 16 out of 29 on the Folstein Mini-Mental Status Examination, which placed her in the impaired range. *Id.* at 11. He described her as "fully incapacitated" when asked whether her "ability to receive and evaluate information effectively, and communicate decisions in any way, is impaired to such a significant extent, that . . . she is partially or totally unable to manage . . . her financial resources,

- 2 -

to meet essential requirements for . . . her physical health and safety." *Id.* at 14-15.

By order of November 22, 2013, Dr. Coleman was appointed emergency guardian of the person and estate for each of his parents. He filed a petition for determination of incapacity and appointment of a plenary guardian of the person and estate for each of his parents pursuant to 20 Pa.C.S.[] § 5501 et seq., on December 10, 2013. On the following day, December 11, 2013, privately-retained counsel filed her appearance on behalf of Mr. Coleman and a motion to appoint a substitute emergency guardian of the person and estate and a guardian ad litem for Mr. Coleman, and to arrange for an independent evaluation of him. By orders of December 16, 2013, the court appointed Helen Stauffer, Esquire, guardian ad litem for Mr. Coleman; ordered his counsel obtain a medical evaluation of Mr. Coleman by a qualified physician of counsel's choosing who would also be acceptable to the guardian ad litem; appointed Shannon Piergallini Smith, Esquire, guardian ad litem for Mrs. Coleman; and scheduled a hearing in each matter for March 4, 2014. By order of January 27, 2014, Mrs. Coleman's guardian ad litem was authorized to arrange for Mrs. Coleman to be evaluated by any living/personal care facility selected by her guardian ad litem to determine Mrs. Coleman's suitability for placement in such level of care.

Dr. Coleman subsequently resigned as emergency guardian of the estate and person for his parents. By order of February 14, 2014, Attorney David Roth was appointed to succeed Dr. Coleman as emergency guardian of the estate of Mr. Coleman and emergency guardian of the estate and person of Mrs. Coleman. As noted in the footnote to that order, no appointment of a successor emergency guardian of the person for Mr. Coleman was made since he appeared to be cooperating with his counsel and his guardian ad litem remained in place. By orders dated March 19, and filed on March 24, 2014, the hearing on the §5511 petition was continued to June 9, 2014; Attorney Stauffer's motion to be discharged as guardian ad litem for Mr. Coleman was granted; and Mrs. Coleman's guardian ad litem was instructed to arrange for a qualified expert to evaluate her.

On May 22, 2014, counsel was appointed for Mrs. Coleman upon the request of her guardian ad litem. The final hearing on the § 5511 petitions was held on June 9, 2014. Mr. Coleman attended with his privately retained counsel; Mrs. Coleman

attended with her court-appointed counsel and her court-appointed guardian ad litem.

. . .

With regard to Mrs. Coleman, she was present along with her court-appointed counsel, Lia Snyder, Esquire, and her court-appointed guardian ad litem, Shannon Piergallini Smith, Esquire.

An independent evaluation was performed on March 26, 2014, by Dr. Donna Miller, an osteopathic physician Board-certified in internal medicine with added qualifications in geriatric medicine, in Mrs. Coleman's assisted living facility, where Mrs. Coleman then resided, in order to evaluate her cognitive capabilities. [N.T. 11/22/13] at 9. Dr. Miller testified she reviewed Mrs. Coleman's medical records available at the facility. They listed her admission diagnoses of dementia, cardiomyopathy, falls, atrial fibrillation, congestive heart failure, alcohol abuse, anxiety and depression, hypertension, hyperlipidemia, osteoporosis, breast cancer, and right radial lobe injury with hand weakness related to a right femoral fracture after a fall. She also reviewed the list of medications Mrs. Coleman was taking on the day of her visit. They included Ramipril for heart failure/hypertension, magnesium supplements, Prilosec, Aldactone, and Ativan as needed for unusual anxiety. *Id.* at 11-12. Dr. Miller talked with Mrs. Coleman and administered various objective tests. Mrs. Coleman scored 22 out of 30 on the Folstein Mini-Mental Status Examination and 16 out of 30 on the St. Louis University Mental Status Examination. According to Dr. Miller, both results were consistent with dementia. *Id.* at 10. Dr. Miller reported Mrs. Coleman could not draw the clock face for the time specified, could not make change calculations correctly, and could not describe any of her medications except a vitamin. Nor could Mrs. Coleman state the amount of her monthly income; she said her husband had always managed all of the money and she had never been interested in doing it. *Id.* at 10-13.

Dr. Miller concluded to a reasonable degree of medical certainty Mrs. Coleman had deficits with memory, judgment, reasoning, some calculation issues, executive functions, problems which are consistent with the diagnosis of dementia. She said Mrs. Coleman's dementia was most likely related to alcohol, alcoholism; characterized the level of her dementia as mild to moderate; and said she was in need of a guardian of her

- 4 -

person and estate. *Id.* at 15, 20. She also said Mrs. Coleman could return to her home with her husband if there was 24-hour in-home care. As Dr. Miller explained it, the reason for 24-hour care was to ensure good nutrition, no alcohol, the right drugs, and very consistent medical care, with consistent providers. That's how she would do well. *Id.* at 18-19.

David Roth, Esquire, Mrs. Coleman's court-appointed emergency guardian of the estate and emergency guardian of her person testified Mrs. Coleman exhibited confusion and lapses of memory. For example, when he spoke with her, she would lose her train of thought; she was not aware of the medication she was taking when she visited the urologist; she failed to disclose her history of alcoholism to the doctor; she would call Mr. Roth's office multiple times with the same request or question; and she would forget medical appointments. *Id.* at 24-25; 27.

Mrs. Coleman's attorney called Dr. John Mitchell, a Board-certified psychiatrist, who examined Mrs. Coleman on April 29, and June 4, 2014. He also had some previous contact with her as a patient, most recently on June 12, 2013, for depression, anxiety and alcohol abuse, and at various other times when she accompanied her husband, who also had been his patient.

Dr. Mitchell described Mrs. Coleman as a 72-year old woman, who was "alert, well oriented, spontaneous, somewhat anxious because she understood the seriousness of why we were meeting . . . quite relevant in all of our conversations . . . able to think and communicate in abstract manner, with relevant analogies . . . [and] goal directed." *Id.* [at] 37. He did note she occasionally made "some minor mistakes related to memory." *Id.* He accepted her representation that she understood alcohol was problematic for her and she was no longer drinking. *Id.* at 38. He also said he administered the St. Louis University Mental Status Examination to her, and she scored 23, "which put her in the mild neurocognitive disorder status, which is not at the level that one would consider dementia." *Id.* at 38, 47-48. He also said she was "cognitively alert" and had a "fairly good understanding of her finances." *Id.* at 39. In short, Dr. Mitchell found Mrs. Coleman had no significant impairment in her reasoning ability or attitude, and she possessed the capacity to conduct her personal and financial affairs.

With respect to Mrs. Coleman's medical condition, Dr. Mitchell understood her to have arthritis, atrial fibrillation, and a history of fractures related to her alcohol abuse. He said she was aware of the medication she was taking and intended to be compliant with it. *Id.* at 10. He further concluded she could formulate reasonable decisions concerning her physical health and safety. *Id.* at 40. He believed Mrs. Coleman could make reasonable decisions relative to giving consent for medical or surgical procedures and purchase or prepare her own meals. He said her short-term memory and working memory were slightly impaired, but her long term memory was good. In sum, he said Mrs. Coleman could handle her own affairs without the need for appointment of guardians to assist her, and could live at home "with the proper kinds of help." He suggested in-home care for six to eight hours per day. *Id.* at 42.

On cross-examination, Dr. Mitchell acknowledged Mrs. Coleman, like many abusers of alcohol, understated her consumption to him when he was treating her in 2013 and that her consumption was enough to cause her to lose her balance, have blackouts and be hospitalized for multiple fractures. Since his treatment of her in late 2013, Mrs. Coleman has not resided in her home but, instead in a rehabilitation facility and then an assisted living facility where, presumably, she would not have had access to alcohol. *Id.* at 44. Dr. Mitchell also relied on Mrs. Coleman's representations when he testified he believed Mrs. Coleman was compliant with her medical treatment and intended to follow through with all of her medical appointments and medical care. However, Dr. Mitchell did not ask Mrs. Coleman who her doctors were to know who she would follow up with, and agreed all of Mrs. Coleman's medical appointments in the last seven or eight months have been either at the nursing home or assisted living facility where she had been residing or where she had been transported by the facility. *Id.* at 46.

Dr. Mitchell was asked if he could explain why Mrs. Coleman scored 16 out of 30 on the SLUMS test on March 26, 2014, with Dr. Miller and 23 out of 30 on June 4, 2014, with him. He suggested the difference could be the result of a general improvement in her condition, perhaps due to medications, or the way the test was administered to her. He also indicated Mrs. Coleman's score of 23 out of 30 on the Folstein Mini-Mental Status Exam administered by Dr. Miller was consistent with her performance on the SLUMS test administered at the same time. *Id.* at 51-53.

Finally, when asked if there was anything else he wanted to say, Dr. Mitchell said allowing Mrs. Coleman to return to her home could present some "difficulty" because Mr. Coleman is "less cooperative, more demanding, very angry." *Id.* at 54.

Trial Court Pa.R.A.P. 1925(a) Opinion, filed September 30, 2014 ("1925(a) Opinion"), at 2-12 (footnote omitted).

On June 17, 2014, the trial court entered a final decree adjudicating Appellant to be an incapacitated person and appointing a plenary guardian of her person and estate. Appellant filed a timely notice of appeal on July 15, 2014. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issue for review:

I. Whether the lower court abused its discretion and committed an error of law in determining that Appellant is incompetent and in appointing a guardian of the person and a guardian of the estate?

Appellant's Brief, p. 6 (all capitals removed).

"The appointment of a guardian lies within the discretion of the trial court and will be overturned only upon an abuse of discretion." *In re Duran*, 769 A.2d 497, 506 (Pa.Super.2001) (citing *Estate of Haertsch*, 649 A.2d 719, 720 (Pa.Super.1994)). This Court will find an abuse of discretion only where "the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Id.* (quoting *Harman ex rel. Harman v. Borah*, 756 A.2d 1116, 1123 (Pa.2000)).

An "'[i]ncapacitated person' means an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that he is partially or totally unable to manage his financial resources or to meet essential requirements for his physical health and safety." 20 Pa.C.S. § 5501. A court may appoint a guardian "only '[u]pon a finding that the person is partially incapacitated and in need of guardianship services,'" or "upon a finding that the person is totally incapacitated and in need of plenary guardianship services[.]" *In re Peery*, 727 A.2d 539, 540 (Pa.1999) (citing 20 Pa.C.S. § 5512.1(b)-(c)) (emphasis deleted). A person is presumed to be mentally competent and a petitioner seeking guardianship must establish incapacity by clear and convincing evidence. *In re Hyman*, 811 A.2d 605, 608 (Pa.Super.2002). "A finding of mental incompetency is not to be sustained simply if there is any evidence of such incompetency but only where the evidence is preponderating and points unerringly to mental incompetency." *Id.* (quoting *In Re Myers' Estate*, 150 A.2d 525, 527 (Pa.1959)). This Court has noted "[a] statute of this nature places a great power in the court. The court has the power to place total control of a person's affairs in the hands of another. This great power creates the opportunity for great abuse." *Id.* (quoting *Estate of Haertsch*, 609 A.2d 1384, 1386 (Pa.Super.1992)).

Here, Appellant challenges the weight of the evidence. *See* Appellant's Brief, pp. 11-19. In short, she claims the trial court should not have placed the emphasis/credence it did on the testimony of Dr. Donna

Miller, an osteopathic physician who performed an independent evaluation of Appellant and who concluded, to a reasonable degree of medical certainty, that Appellant suffers from mild to moderate dementia and was in need of a guardian of her person and estate. *Id.* at 12-15. Instead, Appellant claims the trial court should have placed more emphasis/credence in the testimony of Dr. John Mitchell, whom Appellant presented, and who testified that Appellant's dementia was alcohol-related, that she had ceased consuming alcohol, and that, with appropriate help, Appellant could care for herself and her affairs without the appointment of guardians. *Id.* at 15-19.

The trial court considered both doctors' testimony and discussed the testimony in its opinion. *See* 1925(a) Opinion, pp. 8-12. The trial court ultimately determined:

> Little weight was accorded to the testimony of . . . Dr. Mitchell, who treated and evaluated Mrs. Coleman. . . .
>
> Dr. Mitchell accepted Mrs. Coleman's representation that she understood alcohol was problematic for her and she was no longer drinking. In fact, Mrs. Coleman was a diagnosed alcoholic with a long history of multiple alcohol-related falls and hospitalizations. Dr. Mitchell knew alcoholics habitually understate their use, and Mrs. Coleman had been living in the controlled environment of a hospital and an assisted living facility where, unlike home, it was unlikely she would have access to alcohol. He said Mrs. Coleman had a "fairly good understanding" of her finances, yet Mrs. Coleman herself said she knew little about her finances; her husband had always handled them. She did not know her doctors, yet Dr. Mitchell accepted her assurance she would follow through with all medical appointments and medical care. Finally, Dr. Mitchell acknowledged the results of the two tests Dr. Miller administered to Mrs. Coleman, the Folstein Mini-Mental Status Examination and the St. Louis University Mental Status Examination, which

indicated dementia, were consistent with each other. Additionally, Dr. Miller testified Mrs. Coleman failed other objective tests she administered to Mrs. Coleman, the clock face and change calculations tests, and it does not appear Dr. Mitchell administered any objective tests to Mrs. Coleman other than the same St. Louis University Mental Status Examination administered by Dr. Miller.

1925(a) Opinion, p. 13.

In addition to this medical testimony, the trial court considered the testimony of the court-appointed guardian, Attorney Roth, and of Dr. Mohammed Fawwad Khan, as well as Appellant's in-court appearance and demeanor in rendering its decision. The trial court found the testimony of Dr. Miller supported its conclusion that Appellant requires a guardian. This Court will not substitute its judgment for the lower court. *See In re Hyman*, 811 A.2d at 609 ("[w]e will not substitute our judgment for that of the lower court absent a clear abuse of discretion [.]").

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/30/2015

- 10 -