J-A07008-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE P.O., AN INCAPACITATED PERSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.O. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1587 EDA 2021 |

Appeal from the Order Entered June 30, 2021
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2020-X3236

BEFORE:  DUBOW, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY DUBOW, J.:                    **FILED JULY 15, 2022**

Appellant, P.O., appeals from the June 30, 2021 Order[1] that adjudicated her partially incapacitated and appointed a limited guardian of her person and estate.  Upon review, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

Appellant is a 76-year-old widow without any immediate family and, since 2009, she has lived at Beaumont at Bryn Mawr ("Beaumont"), a continuing care retirement community that provides several levels of care, including independent living and skilled nursing care.  While living at the facility, Appellant has had a history of alcohol abuse, malnutrition, and failure to thrive.  Appellant resided in the independent living section at Beaumont until 2019 when she was hospitalized for an alcohol related incident.  Upon

_____

[1] The order is dated June 29, 2021, but does not appear on the docket until June 30, 2021.

discharge from the hospital, Beaumont staff moved Appellant to the skilled nursing section amid concerns about her lack of self-care and deplorable living conditions while living independently.

During this time, Appellant had a substantial account with stockbroker Scott Wisman at Merrill Lynch.[2] Mr. Wisman consulted with Mark Davidson, Esq., over concerns about Appellant's health, safety, and capacity. Attorney Davidson specializes in trust and estates law and has over twenty years' experience. Attorney Davidson met with Appellant, who expressed that she would like assistance executing a financial power of attorney ("POA"), a healthcare POA, and a will. After several meetings, Attorney Davidson assisted Appellant in executing a financial POA and a healthcare POA; Appellant appointed Attorney Davidson as the agent for both. During several meetings with Appellant to draft her will, Attorney Davidson became increasingly concerned about Appellant's capacity and communicated concerns to staff at Beaumont.

In January 2020, Appellant was permitted to return to independent living after signing a contract that she would permit housekeeping, companion services, and weekly visits from a social worker. At the time, she was purchasing one bottle of vodka per week from Beaumont. After discovering

_____

[2] Appellant's estate is valued at approximately $4 million, and she had approximately $3 million in her account with Mr. Wisman at this time.

an upcharge, Appellant decided to purchase a case of vodka from another source.

On September 28, 2020, Appellant was admitted to Bryn Mawr Hospital after her care companion discovered her lying in bed, covered in feces, with feces on the floor and walls. Hospital testing showed signs of dehydration, malnutrition, elevated white blood cell count, and fever. Appellant was unable to recall the circumstances that led to her hospitalization and did not understand what was happening while in the hospital. Appellant denied alcohol use and did not show signs of withdrawal. Hospital staff suspected dementia and alcohol-induced neurocognitive disorder and contacted Appellant's healthcare POA agent, Attorney Davidson, who reviewed Appellant's hospital records to determine what course of action was in Appellant's best interest. Upon discharge from the hospital, Appellant returned to the skilled nursing facility at Beaumont.

Attorney Davidson subsequently contacted George Ledakis, Ph.D., a clinical neuropsychologist and licensed psychologist, to evaluate Appellant. On October 30, 2020, Dr. Ledakis met with Appellant in the skilled nursing facility at Beaumont. Dr. Ledakis explained to Appellant that the purpose of his visit was to evaluate her decision-making ability. On November 8, 2020, Dr. Ledakis authored a report, which concluded that Appellant met the legal definition for an incapacitated person and diagnosed Appellant with Mild Neurocognitive Disorder, Obsessive Compulsive Disorder, Alcohol Use Disorder, and Paranoid Personality Disorder. On November 23, 2020,

- 3 -

Attorney Davidson filed a Petition for Adjudication of Incapacity and Appointment of Plenary Guardians of the Person and Estate of Appellant.

The trial court held a hearing on the petition on April 22, 2021, May 21, 2021, and June 15, 2021. The court heard testimony from Attorney Davidson; Dr. Ledakis; Nancy Schanne, Appellant's cousin; William McBride, Appellant's hired personal care assistant; Stephen Gollump, M.D.; Appellant; and Heather Heiland, administrator at Beaumont.

Attorney Davidson testified to the above events. Dr. Ledakis testified as an expert in clinical neuropsychology and tendered opinion as to capacity for Appellant. Dr. Ledakis explained to the court that he had been practicing for over twenty years and seen over three thousand patients. Dr. Ledakis testified that he conducted a full neuropsychological evaluation and clinical interview of Appellant, interviewed Beaumont's nursing and administrative staff, interviewed Appellant's hired personal care assistant, reviewed her medical records from Beaumont and Bryn Mawr Hospital, and conducted eighteen separate evaluations to assess Appellant's cognitive levels and decision-making ability. Dr. Ledakis testified that Appellant refused to drink water and drank only Diet Coke, ate the same food at every meal, needs cues and reminders to maintain proper nutrition, is chronically underweight with a baseline weight of 72 pounds, and bathes only with rubbing alcohol and cotton balls. Dr. Ledakis opined that the pragmatic aspects of Appellant's executive functions are impaired, putting her at risk for making bad decisions regarding her welfare, medical care, and financial affairs. Dr. Ledakis further stated that

if Appellant entered independent living, "there's no question in my mind that she would decompensate, absolutely." N.T. 5/21/21 at 41. Dr. Ledakis testified that it was his opinion to a reasonable degree of medical certainty that Appellant was incapacitated and in need of a guardian of her person and estate. Dr. Ledakis opined that Appellant's "impairments and executive skills, specifically her ability to self-direct, to self-monitor, to self-initiate, to exercise good functional judgment, and her essentially complete lack of insight into not only her psychiatric history and her alcohol abuse tendencies, but also the detrimental nature of her actions and her behaviors in the past and that that can, again, repeat itself in the future, lead me to the conclusion that she is incapacitated." *Id.* at 62 (some hyphens added).

Ms. Schanne testified that she is Appellant's first cousin, and last visited Appellant five years ago but remains in touch with Appellant through phone calls. She also stated that she would be willing to serve as guardian of the person for Appellant if needed.

Appellant presented testimony from Dr. Gollump, the Chief of Neurology at Lankenau Hospital since 2004. He testified that he has been a neurologist for forty years and has previously testified as an expert in the area of neurology. Dr. Gollump performed an evaluation of Appellant five months after Dr. Ledakis. Dr. Gollump stated that he conducted a test called the Montreal Cognitive Assessment and reviewed the portion of Appellant's medical records relating to her most recent hospitalization. Dr. Gollump testified that at the time of his evaluation, Appellant was cognitively

- 5 -

competent. Dr. Gollump explained that he believed Dr. Ledakis' conclusions to be accurate at the time that Dr. Ledakis evaluated Appellant, however Dr. Gollump maintained that Appellant's abstinence from alcohol and consistent nourishment since staying in the skilled nursing facility reversed the effects of the neurotoxicity that previously existed. Dr. Gollump testified unequivocally that Appellant was an alcoholic, and if Appellant returns to the use of alcohol, the alcohol has direct neurotoxic effects on her brain and that she needs supervision to keep her away from alcohol, which Dr. Gollump categorized as a "poison" to Appellant. N.T. 4/22/21 at 94.

William McBride testified that Appellant hired him through an agency called Michele's Extended Hands as a personal care assistant. Mr. McBride explained that he helped Appellant three times a week with errands, conducting research on the internet, phone calls, appointments, transporting her, and taking notes during her appointments.[3]

Heather Heiland testified that she was employed by Beaumont as the vice president of health services. Ms. Heiland explained that Beaumont had three levels of care including independent living apartments, a personal care unit where medication management and meal preparation is available, and a skilled nursing unit offering the highest level of care. Ms. Heiland described Appellant as an intelligent, analytical, funny, quirky person who has some

---

[3] At the time of testimony, Appellant employed Mr. McBride as a personal care assistant. However, at the time of closing arguments, Appellant no longer employed Mr. McBride.

psychological issues and likes to complain. Ms. Heiland stated that Appellant is well-liked by staff. Ms. Heiland testified that after Appellant's most recent hospital stay, it took Appellant a few months to get back to her "baseline." *Id.* at 222.

Appellant testified that she moved to Beaumont in 2009, two years after her late husband passed away. Appellant stated that she did not have any children or brothers and sisters. Appellant testified that she was not incapacitated because "I am able to manage everything in my life." N.T. 5/21/21 at 155. Appellant was not able to recall anything about her recent hospitalization except that she was very tired and could not "conduct business." *Id.* at 157. Appellant testified that she tidies up her own apartment and explained that she did not use cotton balls to clean herself; rather, she has used "cotton from a roll of cotton" for over 60 years. *Id.* at 160. Appellant confirmed that she handles her day-to-day financial affairs such as paying bills. Appellant testified that she pays a monthly bill to Beaumont as well as writes checks or uses her credit card to pay bills for her cell phone, medical insurance, car insurance, storage unit, newspaper subscriptions, prescription medicine, and personal companion. Appellant testified, "I am paying approximately $6,200 a month for my lovely apartment, which they will not let me live in, and I'm also paying $121 per day for this lovely 12-by-13-foot room that I am forced to live in." *Id.* at 170. Appellant testified that Merrill Lynch manages her investments, she reviews

the brokerage statements, and her estimated net worth exclusive of real estate was $3.2 million.

Appellant stated she was surprised to see a withdrawal on her statement to pay for Dr. Ledakis, and that no one consulted her about that. Appellant also testified that when she met with Dr. Ledakis, he did not inform her that Attorney Davidson hired him or that he was evaluating her for the purpose of an incapacity proceeding or appointment of a guardian. Appellant informed the court that she wished to appoint a new POA agent other than Attorney Davidson.

Appellant confirmed that she had a "friend" named Mike Montgomery whom she previously appointed as her POA agent. *Id.* at 190. Appellant explained that she was familiar with Mr. Montgomery because he worked at ShopRite supermarket where she used to shop. Appellant explained that one evening she said hello to him when he was outside smoking a cigarette. Appellant stated that she did not trust moving companies and was looking for someone with a truck to help her move. She testified: "So I said to him – this is how desperate I was. I said, do you know anybody with a truck? He said, I have a truck. And the rest is history. He moved me." *Id.* at 191. Appellant further testified that she eventually appointed Mr. Montgomery and his wife, Sue Montgomery, as her financial and healthcare POA agents, but could not recall if this occurred before or after she moved to Beaumont. Appellant explained that she only met Mrs. Montgomery a few times and decided to

revoke the POA agency after she spoke with "a lady" who liked Mr. Montgomery but did not like Mrs. Montgomery. *Id.* at 193.

Finally, Appellant testified that she wished to sell her independent living unit at Beaumont, leave Beaumont, and live in an apartment or another continuing care retirement community.

At the conclusion of the hearings, the trial court adjudicated Appellant partially incapacitated and appointed a limited guardian of her person and estate. Regarding Appellant's health and safety, the trial court limited the guardian to the following powers: (1) to review and approve any request to move to less restrictive living option at Beaumont or to another facility or independent living, and (2) to review and approve Appellant's appointment of a healthcare POA agent. Regarding Appellant's finances, the trial court limited the guardian to the following powers: (1) to review Appellant's financial documents; (2) to conduct a quarterly review of Appellant's finances; (3) to approve Appellant's expenditures over $15,000; and (4) to review and approve Appellant's appointment of a financial POA agent. .

Appellant timely appealed. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

**ISSUES RAISED ON APPEAL**

Appellant raises the following issues for our review:

1. Did the trial court commit error of law when it considered [Appellant]'s past, including allegations of alcohol abuse, as prologue to her future and in restricting her freedom to choose where to live instead of focusing on her current ability to meet essential requirements of her health and safety?

2. Given that the trial court premised the incapacity of person primarily on alleged alcohol abuse, did admissible, clear and convincing evidence establish that Mrs. Ott's past hospitalizations resulted from alcohol abuse and/or that putative alcohol abuse would lead to a future incapacity?

3. Did the trial court commit error of law when it adjudicated [Appellant] incapacitated as to her assets based on a belief that she was at risk of financial exploitation and despite finding that she manages her financial resources?

4. Assuming *arguendo* that "risk of financial exploitation" is a basis for incapacity, did clear and convincing evidence establish that Appellant as of the guardianship hearing (if ever) was at risk of financial exploitation?

Appellant's Br. at 9 (reordered for ease of disposition).

**LEGAL ANALYSIS**

It is well-settled that "[t]he findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support." **In re Jackson**, 174 A.3d 14, 23 (Pa. Super. 2017) (citation omitted). "This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony." **Id.** (citation omitted). This Court's "task is to ensure that the record is free from legal error and to determine if the [o]rphans' [c]ourt's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence." **Id.** (citation omitted)

Consequently, "[o]ur review of the trial court's determination in a competency case is based on an abuse of discretion standard, recognizing, of course, that the trial court had the opportunity to observe all of the witnesses, including, as here, the allegedly incapacitated person." *In re Hyman*, 811 A.2d 605, 608 (Pa. Super. 2002). "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Harman ex rel. Harman v. Borah,* 756 A.2d 1116, 1123 (Pa. 2000). Notably, for an appellant to establish an abuse of discretion, it "is not sufficient to persuade the appellate court that it might have reached a different conclusion under the same factual situation." *Fancsali v. Univ. Health Ctr. of Pittsburgh*, 761 A.2d 1159, 1162 (Pa. 2000).

Under Pennsylvania law, an incapacitated person is "an adult whose ability to receive and evaluate information effectively and communicate decisions in any way is impaired to such a significant extent that [s]he is partially or totally unable to manage [her] financial resources **or** to meet essential requirements for [her] physical health and safety." 20 Pa.C.S. § 5501 (emphasis added). "The court, upon petition and hearing and upon the presentation of clear and convincing evidence, may find a person domiciled in the Commonwealth to be incapacitated and appoint a guardian or guardians of his person or estate." 20 Pa.C.S. § 5511(a). A person is presumed to be mentally competent, and the burden is on the petitioner to prove incapacity

by clear and convincing evidence. *In Re Myers' Estate*, 150 A.2d 525, 526 (Pa. 1959). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

Further, when making a determination of incapacity, the court "shall consider and make specific findings of fact concerning:

(1) The nature of any condition or disability which impairs the individual's capacity to make and communicate decisions.

(2) The extent of the individual's capacity to make and communicate decisions.

(3) The need for guardianship services, if any, in light of such factors as the availability of family, friends and other supports to assist the individual in making decisions and in light of the existence, if any, of advance directives such as durable powers of attorney or trusts.

(4) The type of guardian, limited or plenary, of the person or estate needed based on the nature of any condition or disability and the capacity to make and communicate decisions.

(5) The duration of the guardianship.

(6) The court shall prefer limited guardianship."

20 Pa.C.S. § 5512.1(a).

Where, as here, a court finds a person to be "partially incapacitated and in need of guardianship services, the court shall enter an order appointing a limited guardian of the person with powers consistent with the court's findings of limitations[.]" *Id.* at §§ 5512.1(b), (d). These limitations may include:

(1) General care, maintenance and custody of the incapacitated person.

(2) Designating the place for the incapacitated person to live.

(3) Assuring that the incapacitated person receives such training, education, medical and psychological services and social and vocational opportunities, as appropriate, as well as assisting the incapacitated person in the development of maximum self-reliance and independence.

(4) Providing required consents or approvals on behalf of the incapacitated person.

*Id.* at § 5512.1(b).

Moreover, when a court finds that a "person is partially incapacitated and in need of guardianship services, the court shall enter an order appointing a limited guardian of the estate with powers consistent with the court's finding of limitations, which shall specify the portion of assets or income over which the guardian of the estate is assigned powers and duties." *Id.* at § 5512.1(d).

**Limited Guardian of the Person**

In her first two issues, Appellant avers that the trial court erred when it found Appellant partially incapacitated and appointed a limited guardian of her person. Appellant's Br. at 9. Appellant argues that Attorney Davidson failed to present clear and convincing evidence that Appellant suffered from alcoholism in the past, and that past alcoholism is an inappropriate basis for a finding of incapacity. *Id.* at 36-42, 45-48. Appellant further argues that the trial court should not have considered Dr. Ledakis' testimony because Dr. Ledakis did not inform Appellant about the reason for his evaluation. *Id.* at 42-45.

In its final order, the trial court complied with Section 5512.1 and found, by clear and convincing evidence, that due to Appellant's "mild neurocognitive disorder and impaired cognition as a result of the toxic effects of alcohol use/abuse, she has demonstrated a risk of financial exploitation, as well as a continued risk to her health and safety." Final Decree, 6/30/21, at 1. The court found clear and convincing evidence to adjudicate Appellant partially incapacitated pursuant to Section 5501 and concluded that Appellant needed a limited guardian of her person and estate.

Our review of the record belies Appellant's claim that the trial court based its decision to adjudicate Appellant partially incapacitated solely on her past alcoholism. Rather, the trial court's decision was based on a totality of the evidence presented regarding Appellant's mental health, malnutrition, and history of alcohol abuse. The trial court credited Dr. Ledakis' "thorough" report and expert testimony about Appellant's ability to make decisions and his ultimate opinion that Appellant is incapacitated. Trial Ct. Op., dated 10/14/21, at 7. The trial court opined:

> [Appellant] attempts to characterize the event that led to Appellant's admittance to the hospital and transfer to Beaumont [skilled nursing facility] as the sole cause for her incapacity. To the contrary, the [c]ourt heard Dr. Ledakis testify credibly that Appellant suffers from a number of conditions, including but not limited to: depressive disorder and adjustment disorder with depressed mood, mild cognitive impairment, alcohol abuse disorder, insomnia, poor judgment and lack of insight into her symptoms, mild neurocognitive disorder, chronic untreated primary mental health issues (specifically Obsessive Compulsive Disorder and Paranoid Personality Disorder) in the setting of history of alcohol abuse, poor chronic nutritional intake, and

advancing age, and also executive functioning deficits in reasoning, as well as compulsive eating and drinking habits[.] The evidence established that if Appellant lives independently without the support established by this limited guardianship, Appellant is at risk of harm to herself and is a risk of repeating the episode that landed her in the hospital. In other words, Appellant's combined maladies would cause her to succumb to poor nutrition, poor self-care, and ultimately alcoholism. The Court believes this is not merely a risk but a certitude established by the evidence presented.

*Id.* at 21.

The trial court also credited Dr. Ledakis' testimony that he notified Appellant about the purpose of the evaluation, and discredited Appellant's testimony that she was not informed about the reason for Dr. Ledakis' evaluation. The court opined: "Dr. Ledakis credibly testified that he made Appellant aware of the purpose of her evaluation. He memorialized this in his report. He specifically noticed that he made her aware that there was a question as to her decision-making ability which resulted in this evaluation." *Id.* at 22.

Our review of the record supports the trial court's findings. We decline to reweigh the evidence or usurp the trial court's credibility determinations. Accordingly, we discern no abuse of discretion.

**Limited Guardian of the Estate**

In her third and fourth issues, Appellant argues that the trial court applied the wrong legal standard to conclude that she is partially incapacitated and in need of a guardian of her estate because she was at risk of financial exploitation. Appellant's Br. at 26. Appellant avers that the Section 5501

statutory definition of incapacity requires a trial court to find that a person is "unable to manage [her] financial resources[,]" which does not include a risk of financial exploitation.  *Id.* at 26-27.  Appellant argues that the evidence proved she can manage her day-to-day finances, including paying bills, reviewing her accounts, and even recognizing when Beaumont up-charged her for alcohol, contradicting the trial court's finding that she needed a guardian of her estate.  *Id.* at 28.  Appellant further argues that even if the statutory definition did include a risk of financial exploitation, the petitioner did not present clear and convincing evidence that Appellant was at such risk.  *Id.* at 30.  Appellant's claim does not entitle her to relief.

Our review of the evidence supports the trial court's findings that Appellant is partially incapacitated and in need of a limited guardian of her estate.  Once again, the trial court credited and relied on Dr. Ledakis' expert testimony that Appellant was, indeed, incapacitated and in need of a guardian of her estate.  The court also credited testimony from Dr. Ledakis that Appellant's executive functions are impaired, putting her at risk for making poor decisions regarding her financial affairs.  Moreover, Appellant herself testified that she executed a financial POA and appointed someone she met at the grocery store as the agent  over her approximately $4 million estate and that she could not recall how long she knew him prior to the appointment.

We decline to conclude that the trial court used an incorrect legal standard when it considered Appellant's risk of financial exploitation as one of many factors when weighing her ability to manage her financial affairs.

Importantly, the trial court did not find Appellant to be **totally** incapacitated, or **totally** unable to manage her financial resources. Consequently, evidence that Appellant was able to manage her day-to-day finances does not necessarily contradict the trial court's conclusion that she was unable to manage a subset of her finances, namely expenditures over $15,000 and the appointment of a financial POA agent. Both can be true. The trial court opined:

> Appellant has an estate valued at approximately [$4] million[]. The generous trust Appellant seems to have to give other such control over her financial affairs is alarming, and it warrants the institution of a limited [guardianship] over her estate preceded by the determination of incapacity.

Trial Ct. Op. at 19-20. The court further emphasized that it granted the guardian **limited** power or authority and "Appellant herself retains the ability to exercise powers and make decisions about her finances subject to the above protective measures now in place for her financial wellbeing." *Id.* at 20.

Upon review, the record supports the trial court's findings. The trial court was in a position to assess the credibility of the witnesses and make reasonable inferences from Appellant's testimony regarding her previous choices for POA agents. In accordance with the requirements of Section 5512.1(d), the trial court appointed a limited guardian of the estate and granted powers consistent with the court's finding of limitations. We discern no abuse of discretion.

**CONCLUSION**

- 17 -

Upon review, we conclude that the record is free from legal error and the trial court's findings are supported by competent and adequate evidence. Appellant essentially asks us to reassess the court's determination of credibility of the witnesses, and to reweigh the testimony and evidence presented during the hearings. We cannot and will not do so. Accordingly, Appellant's claims do not garner relief. We find that the trial court did not abuse its discretion when it adjudicated Appellant partially incapacitated and appointed a limited guardian of her person and estate.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2022